CHICAGO ROTOPRINT, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (William Halpin, Appellee).

First District (Industrial Commission Division)   No. 1—86—1167WC

Opinion filed June 10, 1987.—Supplemental opinion filed June 10, 1987.

Braun, Lynch, Smith & Strobel, of Chicago (Mark A. Braun, of counsel), for appellant.

Perz, McGuire, Condon & Ridge, of Chicago (Daniel F. Capron, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Chicago Rotoprint has appealed from an order of the circuit court of Cook County which confirmed the decision of the Industrial Commission awarding compensation to William Halpin.

William Halpin (Halpin) had worked for Chicago Rotoprint (Rotoprint) since December 1, 1975. He was a maintenance machinist, and his duties included repairing printing presses, bindery equipment and all types of graphic arts equipment. Physically, the job entailed a lot of lifting, climbing up "monkey poles," working on slippery oily decks around moving presses, moving cylinders, carrying buckets of tools and replacement parts up two or three stories on a steel ladder. He worked 7¼ hours per day, mostly standing up. He also pulled a tool truck that weighed over 100 pounds.

On April 29, 1978, Halpin was operating a truck when it ran into a steel table. He sustained wounds to his lower abdomen, his left leg and a facial cut. He also suffered pain in his lower abdomen, his back, his face and his legs, from his hips to his feet. He was taken by paramedics to St. Anne's Hospital, where he was hospitalized for a period from April 29, 1978, to May 21, 1978. He underwent emergency surgery on his lower abdomen and his left leg. While he was hospitalized, he was under the care of Doctors Coniglio, Giganiti, Naffah, Holmes, Callahan and a urologist, whose name he could not remember.

After his release from the hospital, Halpin continued to see Dr. Coniglio and Dr. Naffah twice a month and later, every three months. Dr. Conglio prescribed medication and bed rest. Halpin was also taking Coumadin for blood pressure, which he had been taking for the past 20 years. Dr. Naffah continued to monitor his wounds. After they had healed, Dr. Naffah recommended exercise, and he began swimming at the YMCA in August of 1978. He continued to have pain in his left leg and back.

On November 6, 1978, he returned to his regular job at Rotoprint and worked until July of 1979. During that time, he continued to see Dr. Coniglio, Dr. Naffah, and he also saw Dr. Holmes. Dr. Coniglio

prescribed pain killers and muscle relaxants, which he took daily. Dr. Naffah performed tests on his legs to determine why he was still complaining of pain. Both Dr. Coniglio and Dr. Naffah recommended that he see Dr. Holmes. Dr. Holmes examined him and recommended that he see an orthopedic surgeon.

Between November 6, 1978, and July of 1979, Halpin suffered tremendous pain in his legs and back whenever he performed his duties at work. The pain would become so bad that he would sit and cry as a result.

Halpin was again off work from July 8, 1979, to November 14, 1979. During that time, he was seen by Dr. David Hora, who prescribed muscle relaxants and therapy. He underwent therapy for three weeks. He then entered Northwest Community Hospital, where he was put in traction for the pain in his hips, legs and lower back. He was also given therapy daily. He was released from the hospital and had bed rest until he was readmitted to the hospital. While he was hospitalized, he was treated by Dr. Hora, who performed a laminectomy on his back. He also underwent light therapy and exercise and was given medication. After his release from the hospital, he saw Dr. Hora twice. Dr. Hora prescribed Decadron and therapy. He also saw Dr. Coniglio regarding his blood pressure medication.

On November 19, 1979, Halpin returned to work. He had light duties consisting of repairing knife blocks. He sat on a stool to perform this task. He also walked up and down stairs to obtain replacement parts. He experienced pain in his lower back and legs when he walked up stairs and discomfort in his lower abdomen and lower back. He was also uncomfortable on the stool and suffered pain down his back and into his legs to his feet. After six weeks, he worked repairing stackers, which involved lifting heavy steel shafts. He had pain in his spine, lower back, legs and bones. He was hospitalized again in June of 1980 due to pain. X rays were taken and Demerol, Parafon Forte and Tylenol 3 were prescribed for him. He was off of work between June 23, 1980, and July 7, 1980.

Halpin returned to work July 7, 1980, and continued repairing stackers. He saw Dr. Hora three or four times and had therapy three times per week. He experienced lower back pain and pain in his legs when sitting in an automobile. He also saw Dr. Carson, Dr. Hora's associate, who prescribed bed rest, medication and William's exercises. He also saw Dr. Vatz, a neurologist, who administered an EMG test. He continued to experience pain in his legs and abdomen when he was walking or lifting. He also used the whirlpool at the YMCA five days a week when the pain was not too bad.

On December 1, 1980, he was hospitalized at Northwest Community Hospital. He was given a myelogram, a bone scan was taken, and he had surgery on his back. After the operation, he had a drop foot, which necessitated a different type of therapy.

After his release from the hospital on January 3, 1981, he continued to see Dr. Hora. Dr. Hora prescribed medication and electric stimulation. He also wore a patella sleeve on his right knee and an ankle orthesis since December 25, 1980, which was prescribed by either Dr. Hora or Dr. Vatz. After his release from the hospital, Dr. Hora prescribed a quad cane. At the time of the hearing before the arbitrator, he was using a regular cane which had also been prescribed by Dr. Hora.

At the time of the hearing before the arbitrator, Halpin's typical day consisted of physical therapy three times per week, then to the YMCA for a whirlpool. After lunch, he went to bed. However, he also testified that he rode a bicycle and walked about one-half mile, after which he had pain in his legs and lower back.

At the hearing before the arbitrator, the medical evidence was introduced and admitted into evidence in the form of exhibits. Halpin offered the reports of Dr. Robert C. Busch and Dr. Donald S. Miller, both examining physicians. Their reports were offered with the statement that if the doctors had been given a hypothetical question as to whether there might be or could be a causal connection between the incident of April 29, 1978, and Halpin's present state of ill-being, they would answer in the affirmative and that the condition was permanent. In addition to the medical bills and hospital reports, the December 30, 1980, report of Dr. Hora, Halpin's treating physician for his lumbar disc injuries, was admitted which stated that Halpin's disc condition "could possibly be related" to Halpin's accident at work. Further, the records of Dr. Vatz, another of Halpin's treating physicians, were admitted, in which Dr. Vatz indicated that although it was unclear whether his findings of disc disease were related to the original injury suffered by Halpin, "abnormal posture as a result of this injury could produce or aggravate disc symptomatology."

Rotoprint offered a health insurance form signed by Dr. Hora on which was marked that Halpin's injury did not arise out of his employment. It also offered the reports of Dr. Henry Holmes. Dr. Holmes stated in his reports that while Halpin was suffering from symptomatic sciatica, it has no relation to his previous industrial injury. Finally, it offered the report of Dr. Audley E. Loughran, who examined Halpin at the request of the attorney for Rotoprint. On the basis of that examination, Dr. Loughran found no causal relationship.

The arbitrator found that there was a causal connection between Halpin's accident of April 29, 1978, and his present condition of ill-being. The arbitrator also found that Halpin was temporarily totally disabled for 48$^{4}$/$_{7}$ weeks under section 8(b) of the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.8 (b)) and was permanently and totally disabled under section 8(f) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.8(f)). He was also entitled to $2,897.81 for the remaining unpaid medical expenses.

On review, the Commission increased the amount to $5,507.22 for additional medical expenses incurred by Halpin since the arbitration and confirmed the decision of the arbitrator. The circuit court of Cook County confirmed the findings of the Commission, and Rotoprint appealed.

■ On appeal, Rotoprint contends first that the employee failed to prove a causal connection between the April 29, 1978, injury to his abdomen and left leg and diagnosis of his lumbar disc problem. To recover benefits under the Workers' Compensation Act, a claimant has the burden of proving all of his case, including extent and permanency of injury, by a preponderance or greater weight of the evidence, and an award that is not supported by substantial evidence must be set aside. Liability cannot rest upon imagination, speculation or conjecture, but must arise out of facts established by a preponderance of the evidence. (*Arbuckle v. Industrial Com.* (1965), 32 Ill. 2d 581, 585.) Rotoprint argues that Halpin has failed to prove all the elements of his claim by substantial credible evidence, relying on *Deere & Co. v. Industrial Com.* (1970), 47 Ill. 2d 144.

Rotoprint's reliance on *Deere & Co.* is misplaced. In that case, the employee's testimony regarding the circumstances of his injury was contradicted by several witnesses. In fact, no witness gave any evidence that directly supported his position of an industrial accident's causing his injury. In addition, the employee completed an application for a claim under the employer's nonoccupational insurance plan. The supreme court affirmed the decision of the circuit court finding the award to the employee contrary to the manifest weight of the evidence.

In the case before us, there was evidence that Dr. Hora completed the physician's statement portion of a disability claim form for Halpin in which he marked that the lumbar disc condition was not work-related. On the other hand, Halpin was the only witness to testify in the case before us. His testimony was therefore uncontradicted except insofar as the medical conclusions are concerned. Further, the reports of both Dr. Busch and Dr. Miller were admitted into evidence on the ba-

sis that they each would testify that a causal connection existed between the injury of April 29, 1978, and Halpin's present condition. Additionally, there was Dr. Hora's letter of December 30, 1980, in which he stated that there could possibly be a connection, and Dr. Vatz' records, which also indicated that possibility. It is true that Rotoprint's doctors disputed the existence of the causal connection. However, in *Deere & Co.*, the only evidence introduced to show that any industrial accident had actually occurred was the testimony of the employee himself, uncorroborated by any other testimony.

In the case before us, it is not disputed that Halpin suffered an industrial accident on April 29, 1978. The dispute is over whether the lumbar disc condition he suffers from at the present time is causally related to the accident of April 29, 1978.

Rotoprint also argues that the award to Halpin rests on speculation and conjecture. Rotoprint points to the letter from Dr. Hora in which Dr. Hora states that Halpin's disc condition "could possibly be related" to his accident at work. Rotoprint cites numerous cases in which such statements have been held inadequate to support an award. See *County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24; *Bernard v. Industrial Com.* (1962), 25 Ill. 2d 254; *Bugariu v. Conley* (1981), 93 Ill. App. 3d 571.

Rotoprint overlooks the reports of Drs. Busch and Miller. Even if we were to disregard the report of Dr. Hora as being inconsistent with his other report and inadequate, both Dr. Busch and Dr. Miller concluded that there was a causal connection between the accident of April 29, 1978, and Halpin's present condition.

Finally, Rotoprint argues that the record does not support a finding of causal connection. Rotoprint maintains that Dr. Busch's and Dr. Miller's reports merely recited a chronology of medical treatment but did not express opinions on causal connection. At the time Dr. Busch's report was offered into evidence, the following colloquy occurred:

"MR. MARSZALEK: At this time petitioner offers into evidence what has been marked Petitioner's Exhibit No. 32, said exhibit being a report of his examination of the petitioner on or about January 21, 1980. ***.

It is further offered with the understanding if the doctor were propounded a proper hypothetical question and were asked whether there might or could be a causal relationship between the condition of ill-being of that date and the incident described, he would answer in the affirmative the condition is permanent. His opinion would be based upon a reasonable degree of medical and surgical certainty. Certain portions of this report have been

deleted by agreement of counsel.

MR. BRAUN: No objection to the report being received and considered as evidence insofar as the doctor could testify to the alleged objective findings contained therein.

THE ARBITRATOR: 32 may be received."

Dr. Miller's report was admitted into evidence under the same circumstances.

■ It is evident from the record that Rotoprint waived any objection to the method in which the doctors' testimony regarding causal connection was introduced into evidence by not objecting to the understanding as stated by counsel for Halpin and the admission of the exhibit No. 32. An issue not raised in the trial court cannot be raised for the first time on review. *First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 792.

■ ■ It is not the province of a court to substitute its judgment for that of the Industrial Commission merely because it might have made a different finding; however, the findings of the Industrial Commission must be set aside when contrary to the manifest weight of the evidence. (*Caterpillar Tractor Co. v. Industrial Com.* (1983), 98 Ill. 2d 400, 403.) The Commission is the judge of the credibility of the witnesses and the weight to be given to their testimony. It is for the Commission to decide which of the two conflicting medical opinions given in a case is to be accepted. This is true even though the testimony of one may be equivocal. (*Caterpillar Tractor Co. v. Industrial Com.* (1983), 97 Ill. 2d 35, 43.) The Commission was presented with the reports of Drs. Busch and Miller, both of whom found causal connection, as well as the reports of Dr. Vatz and Dr. Hora, who found possible connections. On the other hand, Dr. Holmes and Dr. Loughran concluded there was no causal connection. Rotoprint also refers in its brief to a report by Dr. James Milgram which apparently was an exhibit on review by the Commission. However, that report is not part of the record before this court and therefore cannot be considered by us. It was therefore the prerogative of the Commission to accept the opinions of Halpin's doctors and reject those of Rotoprint. The Commission having done so, it cannot be said that the finding of a causal relationship between Halpin's accident of April 29, 1978, and his present condition of ill-being is against the manifest weight of the evidence.

Rotoprint's second contention on appeal is that Halpin failed to establish that he was permanently and totally disabled. Rotoprint argues that Halpin failed to prove that he was totally incapable of work.

In *A.M.T.C. of Illinois, Inc. v. Indu. ~ial Com.* (1979), 77 Ill. 2d

482, our supreme court stated as follows:

> " '[A]n employee is totally and permanently disabled for the purpose of workmen's compensation benefits when he is unable to make some contribution to industry sufficient to justify payment to him of wages.' [Citations.] However, this does not require that the injured party be reduced to a state of total physical or mental incapacity or helplessness. [Citation.] A person is totally disabled when he cannot perform services except those that are so limited in quantity, dependability or quality that there is no reasonably stable market for them. [Citations.] Therefore, if an employee can take up some form of employment without seriously endangering his health or his life he is not entitled to total and permanent disability compensation. [Citations.]" 77 Ill. 2d 482, 487-488.

In *Ceco Corp. v. Industrial Com.* (1983), 95 Ill. 2d 278, our supreme court again discussed the propriety of an award of permanent and total disability, stating as follows:

> " 'Under *A.M.T.C.*, if the claimant's disability is limited in nature so that he is not obviously unemployable, *or if there is no medical evidence to support a claim of total disability*, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances. However, once the employee has initially established that he falls in what has been termed the "odd-lot" category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market [citation]), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant [citation].' [Citations.]" 95 Ill. 2d 278, 287.

Rotoprint points out that Halpin was a "maintenance machinist," not an unskilled, uneducated person, and that the record is replete with evidence that he was a skilled mechanic. Regardless of the title given to the work Halpin performed, the record before us is clear that his duties required a lot of lifting, climbing up "monkey poles," working on slippery oily decks around moving presses, moving cylinders, carrying buckets of tools and replacement tools up two to three stories on a steel ladder. He also pulled a 100-pound tool truck with a rope. Much of his work had to be performed standing up. Even when he was assigned to work which he could perform sitting on a stool, he still suffered pain.

In the instant case, there was sufficient evidence to support a

claim for total and permanent disability. Halpin testified at length as to the pain and discomfort he continued to suffer despite the frequent hospitalization and continuous medical treatment he was receiving. Further, the reports of Dr. Busch and Dr. Miller indicated that Halpin's condition was permanent. The seriousness of Halpin's injuries was well summarized by the circuit court when it stated:

"He is a laborer who sustained a crushing injury to his left groin and underwent two low back surgeries resulting, *inter alia*, in a drop foot, weakness in his legs, drug controlled pain and the inability to walk without the aid of a foot brace and a quad cane and a knee support."

■ We find therefore that Halpin met his initial burden of proof concerning his disability. It was Rotoprint's duty to prove that suitable employment was reasonably available. (*Ceco Corp. v. Industrial Com.* (1983), 95 Ill. 2d 278, 288.) The most that can be said of Rotoprint's evidence in this respect was that Halpin's job title suggested more skilled than arduous work when actually the opposite was the case. We do not find therefore that Rotoprint has met its burden here.

The award is not against the manifest weight of the evidence, and we affirm the judgment of the circuit court.

Affirmed.

BARRY, P.J., and McNAMARA, McCULLOUGH, and KASSER-MAN, JJ., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE WOODWARD delivered the opinion of the court:

The petition for rehearing alleges that this court erred in considering the medical reports of Dr. Miller and Dr. Busch as providing support for the finding of causal connection between Halpin's industrial accident and his present condition of ill-being, since neither report makes any statement as to that issue. However, the opinion in this case sets forth verbatim the colloquy between the attorneys for both parties and the arbitrator and clearly shows that Halpin's attorney offered the reports of Dr. Miller and Dr. Busch with the understanding that if the doctors were called to testify and were asked a proper hypothetical question, that each doctor would testify that a causal connection existed.

The petition also alleges that this court erred in finding that Rotoprint waived objection as to the testimony on the issue of casual con-

nection by failing to object to the statement of Halpin's counsel and the method by which the doctors' reports were introduced. Rotoprint argues that its counsel "succinctly stated that he waived objection to the report only insofar as the doctor could testify to alleged objective findings," and that it was received for only those purposes.

It is patently clear from the record in this case that counsel for Rotoprint did not succinctly state that he waived objection only insofar as the doctor could testify to alleged objective findings, nor were the doctors' medical reports admitted into evidence only for the purposes of objective findings. No ruling was made by the arbitrator stating that the medical reports were admitted for a limited purpose or that they were received in evidence for a restricted purpose. It was the obligation of Rotoprint's counsel to raise the issue limiting the statement of Halpin's counsel and the purpose of the exhibit. Counsel for Rotoprint failed to do so. Furthermore, no request was made nor did the arbitrator limit or strike the statement of Halpin's counsel that the doctors would testify in the affirmative to a proper hypothetical question on the issue of causal connection.

Finally, Rotoprint argues as follows:

> "It is generally accepted at the Industrial Commission, that a medical report may not be received into evidence over objection as the report would be hearsay and it would deprive the opposite party of its right of cross-examination."

We have previously concluded that no objection was made to the admission of the medical reports. Further, Rotoprint has cited no rule promulgated by the Industrial Commission codifying this "practice" which would compel this court to grant the petition for rehearing.

The petition for rehearing is denied.

BARRY, P.J., and McCULLOUGH, McNAMARA, and KASSERMAN, JJ., concur.