JACQUELINE GRISCHOW, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Community Nursing Service, Appellant).

Second District (Industrial Commission Division)   No. 2—91—0845WC

Opinion filed April 24, 1992.—Rehearing denied June 11, 1992.

James W. Stevenson, of Wiedner & McAuliffe, Ltd., of Chicago, for appellant.

Ralph A. Gabric, of Pfeffer, Becker, Gabric & Cerveny, of Wheaton, for appellee.

JUSTICE STOUDER delivered the opinion of the court:

The appellee, Jacqueline Grischow (claimant), filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*). Following hearings in 1987 and 1988, the arbitrator awarded certain medical expenses, found the claimant was totally and permanently disabled, and awarded $156.67 per week for life as provided in section 8(f) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.8(f)). The Industrial Commission (Commission) held a hearing in November of 1989, where additional evidence was presented. Thereafter, the Commission modified the arbitrator's decision, finding the claimant was temporarily totally disabled for a period of 226$\frac{1}{7}$ weeks and permanently disabled to the extent of 40% of a person as a whole under section 8(d)(2) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.8(d)(2)). The circuit court reversed, finding the Commission's decision was against the manifest weight of the evidence. The court reinstated the arbitrator's decision. The appellant, Community Nursing Service (employer), appeals. We reverse.

The claimant was employed by the employer as a homemaker's aid. The claimant visited homebound clients of the employer. She would prepare meals, wash the clients and assist them in and out of bed. On June 15, 1982, the claimant was washing a client when the client pushed the claimant with her arm. The claimant was pushed backward with her heel catching on a commode. The claimant fell into

a folded wheelchair, landing on her buttocks and hitting her back and head against the wheelchair.

The claimant continued to work for an hour or two and then went home. The claimant testified she hurt from her shoulders to her knees. That afternoon she noticed numbness in her left leg and pain in her right leg. The claimant testified she had never experienced this type of numbness or pain prior to that date.

The next day the claimant went to work; however, she was in pain from her shoulders to her knees. She left work feeling nauseous. The following day the claimant worked approximately four hours. She felt "sicker and sicker" as the day progressed. She went home around noon and has not returned to employment since that date. The claimant later informed her office that she believed her condition made it unsafe for her to return to work.

On June 26, 1982, the claimant was examined by her family physician, Dr. Barry Lewis. She was experiencing pain in her right leg, numbness in her left leg, headaches and dizziness. Lewis prescribed diathermy treatments and ultrasound on the lower back. He advised her to stay off her feet.

On July 22, 1982, the claimant was examined at the employer's direction by Dr. Ken Sanders. According to Dr. Sanders' report the claimant suffered an injury to her trapezius muscle in May of 1981. Thereafter, according to Sanders, claimant experienced pain in her low back and right leg. Sanders' report indicates the claimant saw a physician for her right leg complaint on December 29, 1981. Sanders reported the claimant's complaints were the same after the June 15, 1982, incident as she suffered before; however, the claimant's complaints were markedly increased since that date.

At the November 1987 arbitration hearing, the claimant denied having low back and right leg pain prior to June 15, 1982. She explained she was seen by her physician, Dr. James Migala, in 1981 for problems with her right shoulder and arm. Dr. Migala's records, dated June 23, 1981, reflect an injury to the right upper back, neck and shoulder.

The claimant's condition grew steadily worse in November and December of 1982. A CT scan was done in November of 1982. The claimant continued to experience pain in her right leg and numbness in the left leg. Occasionally her legs would give out and she would fall. On January 3, 1983, the claimant became violently ill to the extent she could not walk, was incontinent and felt as if her legs were going to "blow up."

At the employer's direction, the claimant was examined by Dr. Marshall Matz in January and June of 1983. Matz's January 26, 1983, report indicates the claimant complained of pain in her lower back, and pain and numbness in her legs. Matz observed the claimant appeared to be in no distress, had no limp and walked with a normal gait. She was able to walk on her heels and toes and squat with her buttocks to her heels. She was able to bend forward and touch her toes with her fingertips.

The claimant was also seen by Dr. "Scarf [sic]" in January of 1983. He hospitalized the claimant from January 31, 1983, to February 2, 1983. A myelogram was performed; however, other contemplated procedures were cancelled.

She was examined by Dr. James Migala on March 28, 1983. Migala had treated the claimant for various ailments since the mid 1970's; however, this was the first time he had seen her since the incident the previous June. His diagnosis was that the claimant was suffering from a lumbar sprain. His report noted the November CT scan showed no abnormalities. The claimant testified Migala told her to stay off her feet and not lift anything. He prescribed Indocin, which she testified caused her hair to fall out. Migala subsequently sent her to see a neurosurgeon, Dr. Robert Strzyz.

The claimant's condition continued to worsen during the summer of 1983. On September 12, 1983, a laminectomy was performed at the L5-S1 disc level. The claimant testified that while in the hospital recovering from the surgery her legs "stopped working." This condition required her to use a walker for a couple of months thereafter. Migala's records for September 18, 1983, indicate the claimant was doing well after the laminectomy and was discharged with continuing bilateral leg pain. There is no mention of any difficulty walking.

Migala's report dated October 11, 1983, states the claimant was doing much better; however, she was experiencing numbness in the right heel and toe. She had no leg pain, and he hoped she would return to full activity within a month. His notes of November 11, 1983, indicate she was doing reasonably well, although she experienced pain in her right leg and numbness in the area of the top of her left foot toward the end of the day. Migala's notes of December 23, 1983, state the claimant was still experiencing "symptoms intermittently in both legs." His examination revealed a full range of motion in her spine.

The claimant was seen by Migala in his office on four occasions in 1984 (February, April, June and August). His records reflect continued complaints of numbness in the left leg and pain in the right leg.

The claimant was seen by a rehabilitation nurse in February of 1984. The nurse's report indicates the claimant complained of chronic leg and back pain and that her legs would give out. The report states, "She indicates she feels her problems with her back really started approximately 14 months before the time of the reported injury." The nurse opined the claimant was slightly neurotic, dwelt on her discomfort and might be exaggerating her symptoms.

Migala examined the claimant in February and July of 1985. Migala found the claimant continued to complain of pain in her legs and had limited flexion of the lumbar spine. Migala felt the claimant should seek vocational training and that she could not return to her job with the employer. Migala's notes of October 16, 1985, indicate the claimant's condition had worsened since the summer of 1985. She had complaints of pain in her legs and spasms in her back. Migala decided to contact the Mayo Clinic in Rochester, Minnesota, in order to have the claimant's conditions further evaluated.

The claimant was examined by a team of doctors at the Mayo Clinic in January and again in March of 1986. In a letter to Migala, Dr. Bahram Mokri states their examination revealed the range of motion of the lumbar and cervical spine was normal. They saw no need for further surgery at that time and recommended weight reduction and physical therapy. A second letter from Dr. Mokri indicates Dr. Donald Campbell's examination found degenerative joint disease of the L5-S1 facets, decreased disc space, but no evidence of active radiculopathy. The doctors recommended a nonsteroidal anti-inflammatory medication, physical therapy and weight loss. They recommended the claimant use a TENS unit. Mokri recommended she avoid heavy lifting, and he doubted she could return to work involving the lifting of patients. He opined she was 10% permanently partially disabled.

On August 1, 1986, the claimant was involved in an auto collision when a car rear-ended the Chevy Suburban the claimant was driving. The collision occurred as the claimant was pulling into her driveway. She later testified both vehicles were traveling at low speeds at the time of the collision. The bumper of the Suburban had a gouge in it as a result. The claimant testified before the arbitrator that she had increased pain in her lower back for about two weeks after the incident. She maintained her condition, *vis-a-vis* her back and legs, returned to its previous state soon after the collision.

Migala examined the claimant on August 8, 1986. She complained of neck, shoulder and upper back discomfort. The claimant noted bleeding and swelling near the scar on her lower back and lower back pain which was somewhat worse. Migala believed the claimant suf-

fered a cervical, dorsal and lumbar sprain. By phone, the claimant told Migala on September 2, 1986, that she had swelling and low back pain. Migala's notes of December 12, 1986, and January 19, 1987, note swelling of the left leg.

The claimant was examined by Dr. Daniel Ludwig on March 16, 1987. Via evidence deposition Ludwig testified the majority of his practice was in disability evaluation. His examination of the claimant revealed marked limitation of the lumbar spine and muscle spasms when bending. He also found some irritation of the lumbosacral area of the spine and indications of sciatic nerve root irritation. His diagnosis was herniated disc syndrome of the lumbar spine in post-operative state, narrowing of the fifth lumbar disc space, and arthritis. Ludwig opined the injury could have arisen from the June 15, 1982, incident. He did not think the claimant could be gainfully employed, and it was his opinion her condition was permanent. Ludwig agreed that if the claimant had a normal range of motion prior to the August 1, 1986, auto collision, there could be a causal relation between her condition and the collision of that date.

Hearings were held before the arbitrator on November 25, 1987, and April 21, 1988. At the November 25, 1987, hearing the claimant testified she was told by Migala not to lift, bend, stretch or pull. She was not to sit or stand for more than an hour and a half to two hours at a time. At the April 21, 1988, hearing, the appellant offered Migala's written restrictions received by the insurance carrier in February of 1984. The restrictions state that in an eight-hour day, the claimant could stand and walk one to four hours, sit one to three hours and drive one to three hours. The claimant was not to bend or climb. She could occasionally squat and perform overhead work.

On June 7, 1988, the arbitrator entered an award for medical expenses and found the injuries sustained by the claimant rendered her permanently and totally disabled. Under section 8(f), the claimant was awarded $156.67 per week for life. The arbitrator stated his decision was based on the restrictions imposed by Dr. Migala and the findings of Dr. Ludwig.

A hearing on review was held before the Commission on November 30, 1989, at which further evidence was taken. The claimant testified her left leg went numb when she sat for a period of time and experienced pain down the thighs in both legs. She also stated she fell down at least once a month and that she had numbness in her left leg and pain in the right leg when she stood for more than a hour.

The parties stipulated that additional medical records of Dr. Migala had been forwarded to the arbitrator prior to the arbitrator's de-

cision. In a letter to claimant's attorney dated February 11, 1988, Migala stated the claimant had definite limitations. He stated she could stand no more than one hour, sit no more than an hour and a half, and bend only occasionally. In addition, she should not lift more than five pounds, should not squat or climb ladders, and climb stairs infrequently. In another letter, Migala opined that the majority of her problems resulting from the August 1986 auto collision involved the cervical spine and not the lower back.

At the November 30, 1989, hearing, a rehabilitation specialist, James Percic, testified concerning his efforts to assist the claimant in obtaining vocational retraining and employment. He first met with the claimant on April 4, 1989, and had knowledge of the restrictions placed on the claimant by Migala. He testified Migala gave a full release for training purposes only.

Percic arranged for the claimant to take two courses at the College of Du Page during the summer of 1989 to prepare her for jobs in the clerical field. The claimant did not attend. Migala told Percic it was too far for the claimant to drive and too strenuous. Percic subsequently prepared a rehabilitation plan for the fall of 1989. The claimant phoned Percic on September 21, 1989, and accused him of harassment. She threatened legal action. Percic opined the claimant was a candidate for jobs for which a stable labor market existed. On cross-examination, Percic admitted that because of the restrictions placed on the claimant, Du Page Rehabilitation Services refused to provide services to the claimant.

Admitted into evidence were the work restrictions imposed by Migala dated April 3, 1989. (The day before the claimant was seen by Percic.) He stated she could not work an eight-hour day. She could sit continuously for an hour and a half, four hours intermittently. She could walk one hour continuously, four hours intermittently. She could stand continuously for 20 minutes, three hours intermittently. He opined she could drive only short distances and had reached her maximum improvement. In an open letter dated September 1, 1989, Migala opined the claimant was unemployable because of her physical condition.

A report and work restriction evaluation by Dr. William Hejna were admitted into evidence. Hejna examined the claimant on July 26, 1989. He found she was not able to bend forward completely, but was able to walk on her heels and toes without difficulty. A lumbar MRI was performed on August 4, 1989, which revealed no abnormalities. From his examination and the test results, Hejna concluded, "I am unable to corroborate the degree of subjective complaint which this

patient has with objective findings." He opined she should be able to perform full-time sedentary work, with limited walking, standing, bending, squatting and lifting.

In addition, the employer was allowed to present, as an offer of proof, the claimant's answers to interrogatories given in the legal action arising out of the auto collision. In the interrogatories, when asked to describe her injuries, the claimant responded, "Pain to neck, back and shoulders, difficulty breathing; loss of strength and use of arms; swelling and discoloration of tissue over surgical incision; severe back spasms; driving anxiety." When asked if she had recovered from the injuries received in the collision, the claimant replied, "No. Still suffering from nerve radiculitis which causes continued pain."

The Commission modified the decision of the arbitrator, finding the petitioner was temporarily totally disabled for a period of 226$\frac{1}{7}$ weeks and was permanently disabled to the extent of 40% of a person as a whole under section 8(d)2 of the Act. The Commission stated it considered the entire record in reaching its decision. The Commission affirmed on all other issues.

The Commission made five specific findings. First, it found the claimant was injured when she was pushed by a bedridden client and fell into a wheelchair striking her lower back and legs. Second, the Commission noted the claimant was involved in an auto accident on August 1, 1986, and cited the claimant's answers to the interrogatories. Third, the Commission found the claimant was seen by Dr. Migala for complaints of pain "to her lower back, cervical and right leg on June 23, 1981." In addition, the Commission found the claimant was seen by Dr. Sanders on May 15, 1981, and that she complained of pains to her "low back, cervical and right leg." Fourth, the Commission found Migala's work restriction evaluation of April 1989 did not state the claimant was unemployable. Fifth, the Commission stated it was relying on the evaluation of Dr. Hejna. The Commission noted Hejna opined the claimant could perform full-time sedentary work, could lift up to 10 pounds occasionally, work above her shoulders, operate foot controls and drive a vehicle.

The circuit court reversed, finding the Commission's decision was contrary to the manifest weight of the evidence. The court found the Commission properly considered the interrogatories. The court also found the record supported the decision of the arbitrator and that therefore judgment should be entered for the claimant pursuant to the findings of the arbitrator. The employer, Community Nursing Service, brings the instant appeal.

On appeal, the employer argues the circuit court erred in finding the Commission's decision was against the manifest weight of the evidence. The employer contends the evidence supports the Commission's decision modifying the claimant's award and finding the claimant was not totally and permanently disabled.

■■■ For purposes of section 8(f) of the Act, a person is totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists. (*E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206.) Because of the Industrial Commission's expertise in the area of workers' compensation, its finding on the question of the nature and extent of permanent disability should be given substantial deference. (*English v. Industrial Comm'n* (1986), 151 Ill. App. 3d 682, 502 N.E.2d 1247.) It is not the province of a court to substitute its judgment for that of the Industrial Commission merely because it might have made a different finding. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 98 Ill. 2d 400, 456 N.E.2d 1366.) The Commission is the judge of the credibility of the witnesses and the weight to be given their testimony. (*Chicago Rotoprint v. Industrial Comm'n* (1987), 157 Ill. App. 3d 996, 509 N.E.2d 1330.) It is for the Commission to resolve disputes in the evidence and draw reasonable inferences and conclusions from that evidence, and the Commission's decision will not be set aside on review unless it is contrary to the manifest weight of the evidence. *Presson v. Industrial Comm'n* (1990), 200 Ill. App. 3d 876, 558 N.E.2d 127.

In the instant case, the evidence regarding the extent of claimant's disability was conflicting. She was seen by numerous doctors over a period of seven years. Their evaluations of the claimant's condition varied widely. In addition, there was a 5½-year interval between the injury on June 15, 1982, and the first hearing before the arbitrator in November of 1987. In the interval the claimant was injured in an auto collision. The Commission received extensive additional evidence, including live testimony from the claimant.

In regard to the extent of the claimant's disability, Dr. Ludwig opined the claimant could not be gainfully employed and that her condition was permanent. Ludwig's examination, on which the arbitrator relied, did not take place until March 16, 1987, five years after the initial injury and following the claimant's auto collision.

Migala stated in a September 1989 letter that in his opinion the claimant was unemployable. However, Migala's records reveal his assessment of the claimant's condition changed markedly during the course of treatment from 1983 to 1989. In the fall of 1983, following

her laminectomy, he expected her to return to full activity within a short time. According to his records, her condition did not worsen appreciably until the fall of 1985. He did not see her from December 1985 until after her accident in August of 1986.

The doctors at the Mayo Clinic, who examined the claimant early in 1986, opined the claimant was 10% permanently partially disabled as a result of the condition of her lower back. Dr. Hejna concluded after examining the claimant in July of 1989 and having a lumbar MRI test performed that he could not corroborate her subjective complaints with his objective findings.

Migala's work restrictions of April 1989 stated the claimant could not work a full eight-hour day. He said she could sit continuously for an hour and a half, four hours intermittently. She could walk one hour continuously, four hours intermittently. She could stand continuously for 20 minutes, three hours intermittently. He opined she could drive only short distances. Hejna opined in the summer of 1989 the claimant could perform full-time sedentary work, with limited walking, standing, bending, squatting and lifting.

In sum, the evidence was conflicting, and it was the province of the Commission to resolve disputes in the evidence and draw reasonable inferences and conclusions therefrom. The Commission found Dr. Hejna's opinions and findings more credible. The Commission was free to rely on Dr. Hejna's conclusions. Viewing the record as a whole, it cannot be said the Commission's decision modifying the claimant's award was against the manifest weight of the evidence.

The claimant argues there was no evidence to support the Commission's decision to award temporary total disability benefits only through the day of the auto collision, August 1, 1986.

The determination of the length of an employee's temporary total disability is a question of fact to be resolved by the Commission. (*Presson v. Industrial Comm'n* (1990), 200 Ill. App. 3d 876, 558 N.E.2d 127.) An intervening cause can break the chain of causation between a work-related injury and subsequent disability. *Tee-Pak, Inc. v. Industrial Comm'n* (1986), 141 Ill. App. 3d 520, 490 N.E.2d 170.

In the instant case, the evidence showed the claimant suffered some injury to her lower back in the collision. This fact was demonstrated by the discoloration of her surgical scar and complaints of increased pain following the collision. She had not consulted Migala concerning her lower back for seven months prior to August 1, 1986. The Commission was free to draw reasonable inferences from the evidence. Again, in view of the record, we cannot say the Commission's

determination on this issue was against the manifest weight of the evidence.

The claimant also argues the specific factual findings of the Commission were incorrect and that therefore the circuit court correctly found the Commission's decision was against the manifest weight of the evidence. We note some of the factual statements may be incorrect; for example, the finding that the claimant was seen by Dr. Sanders on May 15, 1981. The record shows the claimant was not seen by Sanders until July of 1982. However, we find the factual inaccuracies in the Commission's written opinion were not controlling facts and that the record when viewed as a whole supports the Commission's decision. A judgment may be sustained upon any ground warranted by the record regardless of whether the particular reasons given therefor in the written opinion are correct. *Material Service Corp. v. Industrial Comm'n* (1985), 133 Ill. App. 3d 907, 478 N.E.2d 1095.

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed, and the award of the Commission is reinstated.

Reversed.

McCULLOUGH, P.J., and WOODWARD, LEWIS, and RAKOWSKI, JJ., concur.