JEWEL FOOD COMPANIES, INC., Appellant, v. THE INDUSTRIAL COMMISSION et al. (Jerry Markarian, Appellee).

First District (Industrial Commission Division)   No. 1—92—3593WC

Opinion filed December 10, 1993.

Stevenson, Rusin & Friedman, of Chicago (John Maciorowski, of counsel), for appellant.

Lannon, Lannon & Barr, Ltd., of Chicago (Richard J. Barr, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant Jerry Markarian filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*). Therein he alleged an injury to his left foot arising out of and in the course of his employment with the Jewel Companies (the employer). In a decision entered on December 23, 1988, the arbitrator found that claimant was temporarily totally disabled from May 2, 1984, through May 31, 1987, a period of $171^5/7$ weeks. The arbitrator further awarded differential benefits of $192 per week for the period of June 1, 1987, through February 26, 1988. The arbitrator also determined that claimant had sustained an 85% loss of his left foot and was disabled to the extent of 10% of the man as a whole. After the Industrial Commission (Commission) heard further evidence, it entered a decision which modified the arbitrator's decision, increasing claimant's loss of use of his left foot to 100% and his disability to 40% of the man as a whole. The Commission affirmed the rest of the arbitrator's decision. The circuit court confirmed the Commission's decision, and this timely appeal followed.

On appeal, the employer raises six issues, namely, (1) whether an award of temporary total disability (TTD) beyond January 22, 1987, was against the manifest weight of the evidence; (2) whether an award under section 8(d)(1) for wage differential is contrary to law, where an award under sections 8(d)(2) and 8(e) is also made; (3) whether denial of credit to the employer of compensation benefits paid to claimant for the accidental injury pursuant to section 8(d)(2) is contrary to law; (4) whether an award under sections 8(d)(2) and 8(e) is contrary to law, where the accident results in injury to one member and other parts of the body develop problems causally related to the injury incurred to that member; (5) whether the Commission's decision as to the nature and extent of claimant's injuries is against the manifest weight of the evidence; and (6) whether the award for claimant's psychiatric bills is contrary to section 8(a)(3).

At the arbitration hearing, claimant testified that he worked for the employer as an assembler, earning $11.40 per hour. While working on February 1, 1984, he was struck in the left foot by a forklift. He was treated at Westlake Community Hospital. The emergency room records indicate he sustained a transverse laceration,

approximately $2^1/2$ inches long, behind the medial malleolus, an abrasion and small pressure injury over the lateral malleolus. The wound was cleaned and sutured, and claimant was discharged, with instructions to seek follow-up care at the employer's medical department. Subsequently, he was treated in the medical department and underwent physical therapy at Westlake Hospital.

On February 27, 1984, upon a friend's referral, claimant went to Dr. Maxwell Corbett, who found healing wounds over the malleoli and induration over the medial side of the ankle. X rays were normal. Dr. Corbett noted that sensation over the injured area was intact and that claimant held his foot in a equinous and inversion position. A short leg cast was applied, and wedges were inserted to promote neutral foot positioning. In subsequent months, Dr. Corbett prescribed physical therapy and alternated the corrective casts with Unna boots and elastic supports. On September 11, 1984, the doctor found claimant had fractured the great toe of his left foot while at home. This injury resulted in recasting. Dr. Corbett removed the cast on October 4, 1984, and found claimant's left foot was "in a reasonably satisfactory position," and the left large toe was healed and non-tender. He released claimant to light-duty work with restrictions against heavy lifting, pushing, or pulling. Claimant was encouraged to ambulate.

Claimant testified that the employer did not have light-duty work available, and he remained off work. Claimant was last examined by Dr. Corbett on October 9, 1984, at which time the latter indicated that he was not yet able to return to full duties and required further treatment.

Claimant then switched doctors and came under the care of Dr. Robert C. Hamilton, who examined him for the first time on October 18, 1984, and found considerable inversion of both feet, with the condition worse on the left. Stress X rays, which were performed on October 20, confirmed Dr. Hamilton's diagnosis of lateral instability. He recommended surgery.

On November 3, 1984, claimant was admitted to St. Joseph Hospital and underwent lateral stabilization of the left ankle with a dacron graft reinforcement. Dr. Hamilton performed the procedure without complication, applied a posterior plaster splint and continued to treat claimant post-operatively. On November 12, 1984, the sutures were removed, and the wound was described as "well-healed." On November 26, 1984, the splint was removed and improved stability was noted. Dr. Hamilton advised him to begin active range of motion and gradual weight-bearing exercises.

In December 1984, Dr. Hamilton reported that claimant would be

able to return to unrestricted work in approximately six months. The doctor subsequently released him to work on January 20, 1985, with a restriction against working in a cold environment. Claimant went back to his previous job for approximately two weeks but was unable to continue. Dr. Hamilton returned him to disability status and prescribed exercises until he could tolerate standing for eight hours per day.

On May 31, 1985, Dr. Arman Kelikian took over claimant's case. Dr. Kelikian noted continued inversion of the left foot. He found full ankle range of motion passively but indicated that the peroneal tendons did not contract properly, which resulted in a lack of active eversion. The doctor reviewed a variety of tests, including stress X rays, which did not show any instability, an arthrogram which was negative for joint changes and loose bodies and other X rays, which indicated the subtalar joint was normal. Dr. Kelkian also performed a synoviogram, which showed some constriction of the sheath about the peroneal tendon. He opined that this condition was the cause of claimant's continued complaints.

On August 8, 1985, claimant was admitted to Northwestern Hospital by Dr. Kelikian, who performed an anterior tibial tendon transfer and peroneus brevis tenodesis. Also, he cast the left foot in marked eversion. In subsequent examinations, claimant reported persistent pain, and Dr. Kelikian noted continuing heel varus. On November 13, 1985, Dr. Kelikian performed subtalar arthrodesis with screw fixation to relieve "subtalar instability and arthritis." The post-operative cast was removed on January 27, 1986, and a leg brace was prescribed. Dr. Kelikian released claimant to return to light-duty work on May 29, 1986, with restrictions against ladder climbing or lifting more than 30 pounds.

In April 1986, the employer referred claimant for vocational evaluation and testing by Crawford Health and Rehabilitation Services, Inc. (Crawford Services). Ms. Renee Mattaliano, the vocational supervisor at Crawford Services, met with claimant. She administered and analyzed a variety of vocational aptitude tests.

Claimant returned to work for the employer in June 1986 but testified that he had to leave after a few hours due to pain and swelling in his left foot. Dr. Kelikian returned him to disability status. Claimant reinjured his foot at home during July 1986. He testified that, at this time, his marriage was deteriorating, and his wife requested a separation in September 1986. Claimant had begun seeing a psychiatrist, Dr. Getsinger, in July 1986, at his wife's suggestion. Claimant testified, "After Dr. Getsinger, when my marriage fell apart, I went to [Proviso] Family Services through

Jewel." When questioned on direct examination about why he sought psychiatric counseling, claimant responded that he was bitter and angry about "life in general."

Dr. Kelikian's treatment notes of August 22, 1986, indicate that claimant was doing well and was released to work with restrictions. During August 1986, Ms. Mattaliano assigned his case to vocational consultant Martin Power, who worked with claimant throughout the latter months of 1986. On a number of occasions, claimant told his vocational consultants that he wanted to work either for the employer or as a truck driver.

The first record of any reference to claimant's back pain is found in Dr. Kelikian's treatment note of September 19, 1986, more than $2^1/2$ years after the date of the accident. Dr. Kelikian noted: "Has 8 mm. leg length discrepancy, has some lumbar irritation, x-rays unremarkable." Dr. Kelikian was not asked to, nor did he, provide any treatment for claimant's back complaints. On February 23, 1987, claimant's back was examined by Dr. Barnett. At that time, claimant stated he had been experiencing significant lower back pain since July 1986. Dr. Barnett found restriction in all movements of the lumbar spine and sciatic nerve root irritation. X rays revealed a flattening of the fourth lumbar disc area and an MRI procedure showed a disc bulge at L4-L5.

On October 30, 1986, in response to a written inquiry from Crawford Services, Dr. Kelikian released claimant to work with the restrictions that claimant could not use stairs, carry more than 50 pounds, or stoop and bend excessively. He indicated claimant could pursue truck-driving positions within those restrictions.

Crawford Services continued to manage claimant's case on behalf of the employer. According to the testimony of both vocational consultants, claimant initially cooperated with its job search efforts but grew increasingly reluctant to pursue anything but a truck-driving position. He obtained a class D license and, in October 1986, inquired into truck-driving school. Claimant's vocational consultants advised him to consider alternative employment due to the physical limitations imposed by Dr. Kelikian. In response, claimant went to Dr. Kelikian and obtained a full work release on January 22, 1987. The full release to return to work indicated his condition had reached a state of permanency, and he was employable as of January 22, 1987. When asked if he recalled advising Crawford Services in January 1987 that he was not going to cooperate with them any further, claimant responded, "There was something indirectly along that line, yes."

Renee Mattaliano, who was reassigned to the case in either late

1986 or early 1987, testified that she provided 10 job leads to claimant on January 22, 1987. When she spoke with claimant, approximately a week afterwards, he admitted not pursuing any of the leads. Claimant told Mattaliano that "he was going back to [the employer] if it killed him." Throughout February 1987, Mattaliano continued to contact him with job prospects, but he did not follow up on any of them.

In spite of his full-duty release, claimant did not return to work until June 1, 1987, when a night security guard position with the employer became available. He was offered the position and accepted it. Claimant continued to work as a security guard through the date of arbitration and received weekly wage differential checks from the employer in the amount of $145.33. Two months after the arbitration hearing in November 1988, he successfully bid for a custodian's job paying $12.30 per hour. As of July 1990, claimant was working for the employer as a custodian earning $12.45 per hour. At that time, he was bidding for a forklift driver position, which paid $15.17 an hour.

Initially, the employer argues that claimant failed to meet his burden of proof in demonstrating he is entitled to TTD payments from January 22, 1987, to May 31, 1987. The employer contends that as of January 22, 1987, claimant's condition of ill-being had reached a state of permanency, and, as of that date, he was no longer entitled to TTD benefits. The employer further argues that it should not pay TTD benefits beyond January 22, 1987, because claimant did not cooperate with Crawford Services in finding employment.

We note that the determination of whether a claimant is entitled to TTD is a question of fact to be decided by the Commission. (*Palmer House v. Industrial Comm'n* (1990), 200 Ill. App. 3d 558.) Unless the Commission's determination of TTD is against the manifest weight of the evidence, the Commission's decision will not be overturned. *Palmer House*, 200 Ill. App. 3d at 564.

■ The record shows that claimant's condition was not stabilized as of January 22, 1987. Claimant continued to see Dr. Kelikian after said date. He received further physical therapy and medication related to his injury. Additionally, as late as May 1987, Dr. Kelikian was still prescribing different sized lifts for claimant's left shoe. Given this evidence, we find that the Commission correctly found that claimant's condition of ill-being had not stabilized as of January 22, 1987.

As to the employer's argument that claimant failed to cooperate in his vocational rehabilitation, the evidence supports the Commission's award of TTD. Martin Power, who handled claimant's case for

Crawford Sevices in the latter half of 1986, testified that claimant contacted 25 employers on his own. Renee Mattaliano testified that in January and February 1987 she provided several job leads for the claimant, who contacted some, but not all, of the employers. Claimant advised Mattaliano that he could not meet his financial obligations if he accepted a job paying $4 per hour. Claimant also indicated to her that he wanted a job which paid a similar wage to the one he was earning when the accident occurred or he wanted to return to work for the employer due to its benefits package. Mattaliano admitted that a number of the job leads she offered to claimant paid $3.35 or $4 per hour. She also conceded that it was reasonable for an injured employee to want to return to a job paying wages at a level near what he was earning prior to his injury.

Further, in January 1987, claimant convinced his treating doctor to remove some of his job restrictions. Claimant then listed his name for a job with the employer and contacted the employer's personnel department. He then told Mattaliano that he was committed to returning to work for the employer. At that point, Mattaliano was instructed to close claimant's case, and she performed no further work on his behalf. Claimant returned to work for the employer on June 1, 1987.

Following January 22, 1987, claimant followed up on some job leads in an effort to obtain employment. Some of the job leads given him by Crawford Services were not appropriate for the claimant. He also made a concerted effort to return to work for the employer. Given this evidence, the Commission properly found that claimant had sufficiently cooperated with vocational rehabilitation and was entitled to the disputed TTD payments.

■ The employer next asserts that the Commission made a wage differential award pursuant to section 8(d)(1) wage for the period of June 1, 1987, through February 26, 1988. The employer further contends that such an award is contrary to law, where awards were also made for the same accidental injury under sections 8(d)(2) and 8(e). We find this argument to be without merit. A cursory review of the record reveals that the Commission never awarded claimant any benefits under section 8(d)(1). Instead, the Commission awarded benefits to claimant under section 8(e) for the injury to his left foot and under section 8(d)(2) for his back condition and his emotional problems. On its own initiative, the employer began making differential payments in June 1987, after claimant took a security guard position. These payments were not made pursuant to an order of the Commission. Consequently, the employer's contention that the Commission made a section 8(d)(1) award does not reflect what the Commission actually ordered.

■ Next, the employer maintains that it is entitled to credit for compensation benefits totalling $9,446.45, which were paid from June 2, 1987, through August 29, 1988, pursuant to section 8(j)(2) of the Act. The employer did not raise this particular issue before the Commission or the circuit court and, thus, has waived it on appeal. *Trans World Airlines v. Industrial Comm'n* (1989), 191 Ill. App. 3d 856.

The employer next argues that the Commission's awards under sections 8(e) and 8(d)(2) were contrary to law. The Commission found that, pursuant to section 8(e), claimant had suffered a permanent loss of his left foot to the extent of 100%. Pursuant to section 8(d)(2), the Commission determined that, due to claimant's back and psychological problems, he was permanently partially disabled (PPD) to the extent of 40%.The employer does not contend that claimant's back and psychological problems did not arise out of the subject injury to his left foot. Rather, the employer maintains that sections 8(d)(2) and 8(e) do not allow for separate awards where, as here, subsequent injuries appear two or more years after the initial injury.

Section 8(d)(2) reads in pertinent part:

> "Compensation awarded under this subparagraph 2 shall not take into consideration injuries covered under paragraphs (c) and (e) of this Section and the compensation provided in this paragraph shall not affect the employee's right to compensation payable under paragraphs (b), (c) and (e) of this Section for the disabilities therein covered." Ill. Rev. Stat. 1983, ch. 48, par. 138.8(d)(2).

In *Mitchell v. Industrial Comm'n* (1986), 148 Ill. App. 3d 690, this court upheld the Commission's award made under sections 8(d)2 and 8(e). The section 8(e) award related to claimant's arm injuries, and the section 8(d)(2) award related to claimant's back problems. All injuries arose from the same incident. The *Mitchell* court stated that "[T]he statutory provisions of section 8(d)(2) and section 8(e) do not preclude awards for back, neck, and head injuries and the partial loss of the use of the left arm, even though the debilities emanate from the same injury." 148 Ill. App. 3d at 697.

■ The employer's emphasis upon the distance in time between the injury to claimant's left foot and his subsequent back and psychological problems is not relevant. There is nothing in the statutes or the case law which indicates that multiple injuries, arising from a single accident, must occur simultaneously. (See *Fermi National Accelerator Lab v. Industrial Comm'n* (1992), 224 Ill. App. 3d 899.) As the supreme court stated in *International Harvester Co. v. Industrial Comm'n* (1970), 46 Ill. 2d 238, "Where the work injury itself causes a subsequent injury, *** the chain of causation is not

broken." (46 Ill. 2d at 245.) Here, there is no dispute that claimant has sustained multiple injuries arising from the same accident. Sections 8(e) and 8(d)(2) do not preclude separate awards related to claimant's left foot injury and his psychological and back problems. Therefore, the Commission did not err in making awards under sections 8(d)(2) and 8(e).

The employer next argues that the Commission's determination of the nature and extent of claimant's injuries is against the manifest weight of the evidence. Because of the Commission's expertise in the area of worker's compensation, its findings on the question of the nature and extent of permanent disability should be given substantial deference. (*Grischow v. Industrial Comm'n* (1992), 228 Ill. App. 3d 551.) It is not a reviewing court's province to substitute its judgment for that of the Commission merely because it might have made a different finding. *Grischow*, 228 Ill. App. 3d at 559.

As noted above, the Commission modified the arbitrator's decision regarding the extent of permanent loss in claimant's left foot from 85% to 100%. The Commission also modified the arbitrator's award of 10% PPD to 40% PPD.

■ The employer maintains that claimant's physical condition has greatly improved, as evidenced by the fact that, as of the hearing on review, he was performing a job which required him to be on his feet eight hours per day and lift 10 to 20 pounds on occasion. In so asserting, the employer ignores the evidence which supports the Commission's decision. Claimant underwent three surgeries in an effort to improve the condition of his left foot; however, none of these operations was completely successful. The last surgery involved a subtalar arthrodesis which fused his left foot. During this operation, wire and a large cancellous bone screw and washer were inserted from the talar neck into the os calcis. Claimant testified that after the third surgery his left foot was "straightened" but still very painful.

The employer sent claimant to Dr. Marquardt, who examined him on November 13, 1986. Dr. Marquardt noted that claimant ambulated with a "gross left-legged limp." Dr. Marquardt also reported that claimant stood poorly on his heels and toes, and he could find no dorisflexion, inversion or eversion. Dr. Marquardt opined that claimant could only return to work in a sedentary position. He also indicated that claimant should not perform a job which required extensive walking, stair climbing, bending or lifting.

On February 23, 1987, claimant was examined by Dr. Barnett, who noted that claimant's left leg was one-half inch shorter than his right one. Dr. Barnett noted that claimant walked with a marked

limp and favored his left leg. Dr. Barnett found atrophy of claimant's left ankle and calf and swelling in his left foot. Inversion, eversion and dorsiflexion of claimant's left foot and ankle were completely absent. Plantar flexion of the left ankle was severely limited when compared to claimant's right ankle.

In an effort to return to a higher paying job, claimant ignored Dr. Marquardt's recommendations and restrictions and returned to work for the employer as a janitor. At the end of a workday, he felt drained. Also, after being on his feet at work, he noticed soreness and burning in his left ankle.

As the circuit court noted, the Commission recognized the severity of the left ankle injury and the fact that claimant was pushing himself beyond his physical limitations in order to work at a higher paying job. Given this record, we find that the Commission's decision as to the extent and permanency of claimant's left ankle injury is not against the manifest weight of the evidence.

■ The employer further argues that the PPD award of 40% was excessive. Claimant testified at the arbitration hearing that his back felt like it was in a "vise." He had to periodically crack his back because of stiffness. At the review hearing, he testified that his back is sore. As noted above, an MRI scan revealed a disc bulge or protrusion at L4-L5. Dr. Barnett examined claimant's back, which was restricted in all movements of the lumbar spine region. Dr. Barnett found sciatic nerve root irritation, and X rays showed flattening of the fourth lumbar disc area.

Moreover, the Commission's decision pursuant to section 8(d)(2) was based, not only on claimant's back disability, but also on his emotional problems. A review of the Parkside records indicates that claimant was bitter and depressed over his job situation. At the hearing on review, claimant testified that he was still undergoing counseling each week, a fact from which the Commission could have reasonably inferred that his emotional problems were deeply ingrained.

Based on this evidence regarding claimant's persistent back and emotional problems, we find that the Commission's award of 40% PPD is not manifestly erroneous.

■ Finally, the employer argues that the Commission's award of $1,106 for mental health services is contrary to law. Claimant asserts that this issue is waived because the employer did not make this argument before the Commission. We agree. The record does not indicate that this particular issue was raised before either the arbitrator or the Commission. Accordingly, we find this issue waived. *Kropp Forge Co. v. Industrial Comm'n* (1992), 225 Ill. App. 3d 244.

The judgment of the circuit court is affirmed.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, SLATER, and RARICK, JJ., concur.