27 January 2000

       Nos. 3-98-1013WC & 3-98-1014WC cons.  

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

INDUSTRIAL COMMISSION DIVISION

MOBIL OIL CORPORATION

Appellant and Cross-

Appellee,

v.

THE INDUSTRIAL COMMISSION 
et
 
al
.

(Brad Clodi
, Appellee and Cross-

Appellant).

)

)

)

)

)

)

)

)

)

)

)

Appeal from the Circuit Court of Will County.

No.  98 MR 0012

Honorable

William Penn,

Judge, Presiding.

Modified Upon Denial of Rehearing

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Brad Clodi, was injured when he was pinned between two forklifts while in the employ of respondent, Mobil Oil Corporation.  Claimant filed an application for adjustment of claim pursuant to the Workers’ Compensation Act (Act) (820 ILCS 305/1 
et
 
seq
. (West 1992)), seeking benefits for his injuries.

Following a hearing, an arbitrator determined that respondent prematurely terminated temporary total disability (TTD) benefits to which claimant was entitled.  The arbitrator also found that claimant’s injuries resulted in (1) a 100% loss of the use of his left leg and (2) permanent disability to the extent of 30% of a person as a whole.  On these bases, the arbitrator awarded claimant benefits under the Act.  The arbitrator also awarded claimant additional compensation under sections 16, 19(k), and 19(l) of the Act.  820 ILCS 305/16, 19(k), 19(l) (West 1992).

The Industrial Commission (Commission), with one commissioner dissenting, (1) reduced the amount of TTD benefits awarded claimant, (2) determined that claimant sustained a permanent disability to the extent of only 20% of a person as a whole, and (3) vacated the award of additional compensation.  The Commission otherwise affirmed the arbitrator’s decision.  On administrative review, the circuit court of Will County reinstated the arbitrator’s finding that claimant’s injuries resulted in a permanent disability to the extent of 30% of a person as a whole.  In all other aspects, the court confirmed the Commission’s decision.

Both parties appealed from the circuit court’s order.  In appeal No. 3-98-1013WC, respondent argues that the Commission’s award of permanent partial disability (PPD) benefits to the extent of 20% of a person as a whole was not against the manifest weight of the evidence.  In appeal No. 3-98-1014WC, claimant argues that the circuit court erred in confirming the Commission’s vacation of additional compensation under sections 16, 19(k), and 19(l) of the Act.  We consolidated the appeals for purposes of review.  We now reverse and remand with directions.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The underlying facts are undisputed.  In the summer of 1992, respondent hired claimant and his twin brother, Brian, as temporary, summer employees.  Both claimant and Brian worked the midnight shift as forklift operators.  On June 16, 1992, shortly after midnight, claimant was standing behind his parked forklift when he was struck by a forklift driven by Brian.  Immediately after the accident, claimant noticed that his left leg had been almost completely severed.  Claimant was ultimately taken to Loyola University Hospital (Loyola) for treatment.

At Loyola, it was determined that claimant suffered a severe grade 3-C left tibia fibula fracture with dyvascular limb, a left anterior column acetabular fracture, and an iliac wing fracture to the left hip.  On June 16, 1992, Dr. Pietro Tonino performed a below-the-knee amputation of claimant’s left leg.  The following day, Dr. Michael S. Pinzur performed a debridement.  On June 20, 1992, Dr. William R. Dobozi performed an open reduction and an internal fixation of claimant’s displaced left anterior column acetabular fracture and of claimant’s displaced left iliac wing fracture.  At that time, Dr. Dobozi noted that claimant’s injuries could lead to traumatic arthritis of the left hip, myositis, loss of motion, and numbness.  On June 24, 1992, Dr. Pinzur performed a revision of below-the-knee amputation and closure.

During claimant’s stay at Loyola, Dr. Deborah L. Couch performed a psychiatric examination of claimant.  Dr. Couch noted that considering claimant’s injuries, he was in fairly good spirits.  Dr. Couch diagnosed claimant with post-traumatic stress disorder and adjustment disorder with mixed emotional features of depression and anxiety.

Claimant was released from Loyola on June 29, 1992.  Claimant saw Dr. Pinzur on July 7, 1992.  At that time, Dr. Pinzur planned to commence prosthetic limb fitting once Dr. Dobozi cleared claimant to start weight bearing.  During a June 21, 1992, visit, Dr. Pinzur reported that claimant had excellent hip motion.  On August 4, 1992, Dr. Pinzur noted that claimant’s wound was granulating nicely and that he was getting ready to fit claimant with a preparatory limb.  In his notes pertaining to claimant’s August 18, 1992 appointment, Dr. Pinzur stated that claimant’s wound was almost healed and that claimant was walking with a prepatory prosthesis.

Following his release from Loyola, claimant received physical therapy at St. Mary’s Hospital in Kankakee, Illinois.  At St. Mary’s, claimant’s therapy regimen included whirlpool treatments and stretching exercises.

Claimant returned to school at the start of the fall 1992 semester.  While at school, claimant received physical therapy at BroMenn Regional Medical Center in Bloomington, Illinois.

In a letter dated August 25, 1992, respondent informed claimant that, "[i]nasmuch as you have been released by your doctors and have returned to school your temporary total disability benefits will be suspended."  In place of TTD benefits, respondent decided to commence PPD benefits pursuant to section 8(e)12 of the Act (820 ILCS 305/8(e)12 (West 1992)), for the loss of use of claimant’s left leg.

In a September 16, 1992, letter, Dr. Dobozi updated respondent on claimant’s medical progress.  Dr. Dobozi explained that claimant’s hip was healed and that although claimant had a full range of motion in his hip, he was still undergoing physical therapy for strengthening of his thigh muscles and range of motion to his knee.  Dr. Dobozi also noted that claimant was fitted with a prosthesis and was taking care of his open wound around his stump.  Dr. Dobozi opined that claimant would not have problems in the future with the pelvic and acetabular fractures because those injuries had completely healed.

Claimant saw Dr. Pinzur again on March 25, 1993.  At that time, Dr. Pinzur noted that although claimant suffered from a mild limp and mechanical back pain, he was functioning very well.  In response to inquiries from claimant as to whether he would have been able to return to work in the fall of 1992, Dr. Pinzur opined that if claimant was a worker, he would not have been able to return to even light-duty work until the beginning of 1993.

During the summer of 1993, claimant received physical therapy at Physical Therapy Center Limited in Bradley, Illinois.  Claimant last saw Dr. Pinzur on July 23, 1993.  At that time, Dr. Pinzur reported that claimant was walking with very little discomfort, although he still had a slight limp.  Dr. Pinzur attributed the limp to a combination of the amputation and the pelvic fracture.  Dr. Pinzur then revised his estimate as to when claimant would have been able to return to work, stating that a reasonable time would have been about one year after the injury date.

In a letter dated November 4, 1994, and directed to respondent, claimant’s attorney protested respondent’s decision to cut off TTD benefits as of August 25, 1992.  Relying on Dr. Pinzur’s March 25, 1993, and July 23, 1993, treatment notes, claimant requested TTD benefits through the one-year anniversary of the accident.  In response, respondent’s counsel explained that it terminated claimant’s TTD benefits on August 25, 1992, because (1) claimant was a seasonal employee who had planned to return to college following his summer 1992 employment with respondent and (2) claimant did return to college as scheduled.  In a letter dated December 16, 1994, claimant’s attorney again requested additional TTD benefits.  On January 5, 1995, respondent denied claimant’s request and wrote, "[i]t appears that the only way we will be able to resolve this issue is through litigation."

At the time the arbitration hearing was held on December 7, 1995, claimant was employed by Valspar Corporation as a fitness and wellness director.  Claimant testified that when he returned to college in the fall of 1992, he was unable to walk without crutches.  Claimant also explained that since his wound had reopened from an infection, he was required to dress the wound a couple of times a day to aid the healing process.  Although claimant was fitted with a temporary prosthesis upon his return to school, it was fitted loosely so as to not irritate the amputation sight as it healed.  Claimant stated that he was paranoid about having only one leg and that he was glad to have the prosthesis.  Claimant’s wound healed around December 1992 or January 1993.  At that same time, claimant ceased using crutches.

Claimant graduated from college in May 1993 with a degree in corporate fitness, a major he elected before sustaining his injuries.  Claimant explained that his injuries "really affect[]" him in his job everyday.  According to claimant, because of his injuries, he cannot demonstrate or participate in many lower body exercises.  Claimant testified that while he no longer suffers any pain in his hip, he does experience stiffness, lack of flexibility, and loss of range of motion in that area.  Claimant attributes his limp to his hip injury because he feels his hip shift every time he walks.  Claimant related that before the accident, he participated in sports such as baseball, basketball, football, and tennis.

Claimant described his relationship with Brian before the accident as competitive but close.  Since the accident, claimant explained that he and Brian still get along, but it is hard for them to be around each other.  Claimant also stated that he and Brian have never really discussed the accident which resulted in his injuries.

On cross-examination, claimant reiterated that he chose his major before he was involved in the accident and that he decided to retain the same major after the accident.  Claimant acknowledged that in his position as corporate fitness director, he can use his disability as an asset.  Claimant also admitted that during the fall 1992 semester he completed 16 credit hours of college courses.  During the same semester he worked approximately ten hours per week in the college’s wellness center, a position for which he was minimally compensated.  In the spring 1993 semester claimant had a full-time internship at a fitness center.  According to claimant, he had always planned to return to school in the fall of 1992 following his employment with respondent.

Also admitted into evidence was a medical report prepared at claimant’s request by Dr. D. A. Lindell and a medical report prepared at respondent’s request by Dr. Boone Brackett.

According to Dr. Lindell’s report, claimant’s left pelvis drops slightly when walking.  Nevertheless, Dr. Lindell found that claimant is able to perform the critical duties of his job.  Dr. Lindell opined that, although claimant’s injuries would not adversely impact claimant’s chosen career, the injuries did have a significant impact on claimant’s physical activities.  Finally, Dr. Lindell stated that because claimant’s injury was intra-articular, he has the potential for developing significant degenerative joint disease at the hip, which could eventually require total hip arthroplasty.

Dr. Brackett’s examination revealed that claimant has 20% less internal and external rotation of the left hip as compared to the right hip.  Dr. Brackett opined that claimant could have returned to work as early as September 1992.  Dr. Brackett acknowledged that at that time, claimant was ambulatory only using crutches, but noted that claimant’s left hip fracture had healed and motion had returned.  According to Dr. Brackett, the only limitation on the type of work that claimant could perform would by work which required two limbs.

The arbitrator rendered his decision on March 8, 1996.  The arbitrator found that respondent prematurely cut off claimant’s TTD benefits.  In support of this finding, the arbitrator noted that until January 1993, claimant was using crutches.  Additionally, because the stump of claimant’s leg required regular dressing changes several times a day, claimant did not use the prosthetic leg for anything other than cosmetic purposes.  Moreover, the arbitrator noted that in his March 25, 1993, report, Dr. Pinzur opined that claimant would not have been able to return to even light-duty type work until the beginning of 1993, and in his July 23, 1993, report, Dr. Pinzur opined that a reasonable time for claimant to return to work was one year after the date of the injury.  The arbitrator admitted that claimant returned to college in August 1992 and held a part-time job; however, the arbitrator felt that such minimal activity was insufficient to eliminate a finding of TTD during this time given the extent of claimant’s injuries.  Accordingly, the arbitrator awarded claimant TTD benefits in the amount of $216.26 per week for a period of 49 weeks.

The arbitrator also determined that claimant was entitled to the sum of $194.63 for a period of 200 weeks because the injuries sustained caused 100% loss of use of his left leg.  820 ILCS 305/8(e)12 (West 1992).  The arbitrator further awarded claimant the sum of $194.63 for 150 weeks because the injuries caused a permanent disability to the extent of 30% of a person as a whole.  820 ILCS 305/8(d)2 (West 1992).  In support of an award of benefits under section 8(d)2 of the Act, the arbitrator cited (1) the surgery claimant underwent to repair his hip, (2) claimant’s testimony that he suffered a limp due to his hip injury, (3) Dr. Lindell’s testimony regarding claimant’s hip condition, (4) Dr. Brackett’s testimony regarding claimant’s hip condition, and (5) Dr. Couch’s psychological diagnosis. 

Finally, relying on respondent’s August 25, 1992, letter to claimant, as well as the correspondence between the parties’ attorneys, the arbitrator awarded claimant $5,298.37 as penalties pursuant to section 19(k) of the Act for carrying on proceedings which did not present a real controversy, $2,500 as penalties under section 19(l) of the Act for withholding TTD benefits, and $2,910.35 in attorney’s fees pursuant to section 16 of the Act for respondent’s violation of section 19(k).

A majority of the Commission determined that claimant reached maximum medical improvement on January 12, 1993.  Therefore, it  found that claimant was entitled to TTD benefits for a period of only 30 1/7 weeks.  The Commission also determined that claimant’s injuries only caused a permanent disability to the extent of 20% of a person as a whole.  Therefore, it reduced claimant’s award of benefits under section 8(d)2 of the Act to a period of 100 weeks.

Finally, the Commission vacated the award for penalties and attorney’s fees.  In so doing, the Commission found that "under the unique facts of this case," respondent could have reasonably concluded in August 1992 that claimant’s condition had stabilized based on (1) Dr. Dobozi’s September 16, 1992, medical report; (2) Dr. Pinzur’s medical notes of July 21, 1992, and August 18, 1992; and (3) claimant’s status as a full-time student.  The Commission also explained that respondent did not "withhold" any benefits because it merely changed the characterization of benefits from TTD to PPD and because claimant received an uninterrupted stream of income.  In all other respects, the Commission affirmed the arbitrator’s decision. 

Commissioner Kinnaman dissented from the Commission’s decision.  She wrote that it was improper for respondent to terminate TTD benefits.  She noted that the first reason given by respondent for the termination in its August 25, 1992, letter (that claimant had been released by his doctors), was false.  She also found that there was no case law to support the termination of TTD benefits on the basis that claimant had returned to school. According to Commissioner Kinnaman, claimant was entitled to TTD benefits until such time as the healing process had been completed.  
As of August 25, 1992, claimant’s medical records showed that his leg was still healing at the amputation sight.  Therefore, Commissioner Kinnaman concluded that the termination of TTD benefits by respondent was unreasonable and required the imposition of penalties and attorney’s fees.

The circuit court of Will County determined that the Commission’s finding that claimant had sustained a permanent disability to the extent of 20% disability of a man as a whole, was against the manifest weight of the evidence.  Therefore, the court reinstated the arbitrator’s finding that claimant had sustained a permanent disability to the extent of 30% of a person as a whole.  The court otherwise confirmed the Commission’s decision.  

II. ANALYSIS

A.  Permanent Partial Disability

Respondent argues that the circuit court improperly substituted its judgment for that of the Commission in finding that claimant’s injuries resulted in a permanent disability to the extent of 30% of a person as a whole.  According to respondent, there was ample evidence in the record to support the Commission’s finding that claimant’s injuries resulted in a permanent disability to the extent of only 20% of a person as a whole.

In addressing this issue, we initially note that the loss of the use of claimant’s left leg is not at issue, because, pursuant to section 8(e)12 of the Act (820 ILCS 305/8(e)12 (West 1992)), claimant received the statutory maximum award of 200 weeks compensation for that injury.  Thus, our sole responsibility is to determine whether the Commission’s finding that claimant’s remaining injuries entitle him to an award of permanent disability to the extent of 20% person as a whole, is against the manifest weight of the evidence.  See 820 ILCS 305/8(d)2 (West 1992).

It is well-settled that because of the Commission’s expertise in the area of worker’s compensation, its findings on the question of the nature and extent of permanent disability should be given substantial deference.  
Jewel Food Cos., Inc. v. Industrial Comm’n
, 256 Ill. App. 3d 525, 534 (1993).  It is not the province of a reviewing court to substitute its judgment for that of the Commission merely because it might have made a different finding.  
Grischow v. Industrial Comm’n
, 228 Ill. App. 3d 551, 559 (1992).  It is for the Commission to resolve disputes in the evidence and draw reasonable inferences and conclusions from that evidence, and the Commission’s decision will not be set aside on review unless it is contrary to the manifest weight of the evidence.  
Grischow
, 228 Ill. App. 3d at 559.

In order for a finding to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent.
  
Price v. Industrial Comm'n
, 278 Ill. App. 3d 848, 852 (1996).  In other words, a decision is against the manifest weight of the evidence only when the evidence is viewed in the light most favorable to the Commission and the court determines that no rational trier of fact could have agreed with the Commission's decision.  
Price
, 278 Ill. App. 3d at 852-53.  Based on the record before us, we find that there was sufficient evidence to support the Commission’s decision that claimant’s injuries resulted in the permanent partial loss of the use of claimant’s person to the extent of only 20% disability of a person as a whole.

In this case the medical evidence tended to show that while there is a possibility that claimant will suffer some problems arising out of his hip injury in the future, his overall prognosis is good.  For instance, immediately following claimant’s injury, Dr. Dobozi commented that claimant’s injuries could lead to traumatic arthritis of the left hip, myositis, loss of motion, and numbness.  However, in his September 16, 1992, report, Dr. Dobozi noted that claimant’s hip fractures had healed and that he did not expect claimant to have any problems with his hip in the future.

Dr. Pinzur’s medical reports also reflect a positive prognosis.  On July 7, 1992, Dr. Pinzur reported that claimant had excellent hip motion.  On March 25, 1993, Dr. Pinzur noted that although claimant suffered from a minor limp and mechanical back pain, he was functioning very well.  During a July 23, 1993, visit, Dr. Pinzur related that claimant was walking with very little discomfort, although he reiterated that claimant did have a slight limp, which was attributable to the amputation and the pelvic fracture.

In her medical report, Dr. Lindell observed that claimant’s left pelvis drops slightly when walking.  Further, although Dr. Lindell opined that claimant’s injuries may require total hip arthroplasty, she noted that claimant was able to perform the critical duties of his job.  Dr. Lindell also cautioned that while claimant’s injuries would not adversely impact claimant’s career, the injuries did have a significant impact on his physical activities.  Dr. Brackett’s examination revealed that claimant has 20% less internal and external rotation of the left hip as compared to the right hip.  However, Dr. Brackett opined that there were few limitations on the type of work that claimant could perform.

Also supporting the Commission’s finding is claimant’s own testimony.  At the arbitration hearing, claimant testified that he experiences stiffness, lack of flexibility, and loss of range of motion in the hip area.  However, despite these conditions, claimant was fruitfully employed in his chosen career of corporate fitness.  Moreover, claimant stated that other than certain lower body exercises, there were few limitations on the type of activities that he could perform.

Based on this testimony, we cannot say that the Commission’s finding that claimant suffered a permanent disability to the extent of only 20% of a person as a whole was against the manifest weight of the evidence.

B.  Penalties and Attorney’s Fees

We now address claimant’s challenge to that portion of the circuit court order which confirmed the Commission’s decision to vacate the arbitrator’s award of penalties and attorney’s fees pursuant to sections 16, 19(k), and 19(l) of the Act.  Claimant points out that at the time that respondent decided to terminate his TTD benefits, a physician was still treating him and he had not been cleared to return to any type of work.  Claimant also notes that Dr. Pinzur’s medical notes suggest that the earliest that he could have returned to even light-duty work was the beginning of 1993.

Pursuant to section 16 of the Act, the Commission may assess attorney’s fees against an employer when the employer unreasonably fails to pay all compensation due the employee.  Section 19(k) permits the Commission to award additional compensation to the employee in cases in which the employer has instituted or carried on proceedings which do not present a real controversy, but are merely frivolous or for delay.  Section 19(l) permits the award of additional compensation in cases in which the employer withholds or refuses to pay weekly TTD benefits.  The intent of these sections is to implement the Acts’s purpose to expedite the compensation of industrially injured workers and penalize an employer who unreasonably, or in bad faith, delays or withholds compensation due an employee.  
McMahan v. Industrial Comm’n
, 289 Ill. App. 3d 1090, 1093 (1997), 
aff’d as modified
, 183 Ill. 2d 499 (1998).

An award of penalties and the assessment of attorney’s fees is not proper if an employer’s nonpayment is based upon a reasonable and good faith challenge to liability.  
Miller v. Industrial Comm’n
, 255 Ill. App. 3d 974, 979 (1993).  Our supreme court has stated that an employer’s belief is honest only if the facts in the possession of a reasonable person in the employer’s position would justify it.  
Board of Education of City of Chicago v. Industrial Comm’n
, 93 Ill. 2d 1, 10 (1982).  The burden of proof is on the employer.  
McMahan
, 289 Ill. App. 3d at 1093; 
Miller
, 255 Ill. App. 3d at 980.  The Commission’s determination as to the employer’s reasonableness will not be disturbed unless it is against the manifest weight of the evidence.  
Miller
, 255 Ill. App. 3d at 980.  In this case, we find that respondent did not carry its burden of proving the reasonableness of its decision to suspend claimant’s TTD benefits as of August 25, 1992.

An employee is temporarily totally incapacitated until he reaches maximum medical improvement.  Put differently, an employee is temporarily totally incapacitated from the time an injury incapacitates him until such time as the employee’s condition has stabilized or the employee has recovered as far as the permanent character of the injury will permit.  
Whitney Productions, Inc. v. Industrial Comm’n
, 274 Ill. App. 3d 28, 30 (1995);  
Ingalls Memorial Hospital v. Industrial Comm’n
, 241 Ill. App. 3d 710, 716 (1993).

In this case, the medical evidence shows that as of August 25, 1992, claimant had not recovered as far as the permanent character of the injury would permit.  At that time, claimant was using a prepatory prosthesis and was ambulating on crutches.  Moreover, because the amputation sight was not healed, claimant was required to dress the wound at least a couple of times a day and he could only wear the prepatory prosthesis loosely.  In addition, claimant was consistently receiving physical therapy at that time.  Most importantly, there is no evidence in the record that as of August 25, 1992, a doctor had released claimant to return to work.  Based on this evidence, we do not find that a reasonable person in respondent’s position would have suspended claimant’s TTD benefits.

Nevertheless, relying on 
Manis v. Industrial Comm’n
, 230 Ill. App. 3d 657 (1992), respondent argues that it could infer from the medical evidence that claimant’s condition had stabilized as of August 25, 1992.  We find claimant’s reliance on 
Manis
 to be misplaced.

In 
Manis
, the claimant suffered an injury in her shoulder area while at work.  She was authorized to return to work by Dr. Lim on September 12, 1988, without any restrictions.  Upon returning to work, the claimant’s pain increased substantially.  The claimant then sought chiropractic treatment from Dr. Tenny, who recommended that the claimant change jobs.  On November 7, 1988, Dr. Lim reviewed the claimant’s injury and wrote, "[b]ecause of her neck problem, it is not advisable for her to continue in her present occupation. *** I suggest that she change her job to a less physically demanding job.  She should have a job that does not involve constant motion of the arm, shoulder and neck."  In affirming the Commission’s finding that the claimant was not entitled to TTD benefits after November 7, 1988, we held that it could be inferred that the claimant’s condition had stabilized from Dr. Lim’s recommendation that the claimant change her occupation.

Unlike the facts in 
Manis
, there is no medical evidence from which respondent could infer that as of August 25, 1992, claimant’s condition had stabilized.  There was no suggestion that claimant’s injury would allow him to work at any job after August 25, 1992.  Nowhere in the record have we been able to locate a specific return to work date.  Further, as we discussed above, as of August 25, 1992, claimant was using a prepatory prosthesis and ambulating on crutches, claimant was required to dress the wound at the amputation sight because it had not healed, and claimant was undergoing physical therapy and medical treatment.

Respondent also insists that claimant’s status as a full-time student requires us to conclude that it could have reasonably suspended claimant’s TTD benefits on August 25, 1992.

We agree with the arbitrator that the type of minimal activity engaged in by claimant, attending classes and working 10 hours per week in his college’s wellness center, is insufficient to eliminate a finding of TTD given the extent of claimant’s injury.  Moreover, there is no case law supporting a theory that attending school in and of itself disqualifies an injured worker from receiving TTD benefits.  Indeed, we reject such a proposition.  Many industrially injured individuals realize that they may not be able to return to their original line of work.  We do not want to discourage these individuals from furthering their education when they have not reached maximum medical improvement and they have taken the initiative of enrolling in school.

We also note that the other reason proffered by respondent in its August 25, 1992, letter for terminating benefits, 
i.e.
, that claimant was released by his doctors, has absolutely no support in the record.  Dr. Pinzur first breached the subject of claimant’s return to work during claimant’s March 25, 1993, visit.  In his notes pertaining to that appointment, Dr. Pinzur opined that the earliest claimant could have returned to even light-duty work was early 1993.  However, there is no specific return to work date found in the record.

In its decision, the Commission found that respondent could have reasonably concluded in August 1992, that claimant’s condition had stabilized based on (1) Dr. Dobozi’s September 16, 1992, medical report, (2) Dr. Pinzur’s medical notes from July 21, 1992, and August 18, 1992, and (3) claimant’s status as a full-time student.  We respectfully disagree with the Commission’s analysis.

First, we note that when respondent made the decision to suspend claimant’s TTD benefits, it could not have relied on Dr. Dobozi’s September 16, 1992, medical report, since that document was not in existence at that time.  Second, while Dr. Pinzur’s July 21 and August 18, 1992, medical notes show that claimant was progressing, Dr. Pinzur did not release claimant to work.  Third, as discussed above, there is no support for the proposition that claimant’s status as a full-time student disqualifies him from receiving TTD benefits where claimant had not reached maximum medical improvement.  Indeed, we note that even the Commission itself determined that claimant had not reached maximum medical improvement until January 12, 1993.

T
he Commission also determined that regardless whether claimant received TTD or PPD benefits after August 25, 1992, claimant received "an uninterrupted stream of income."  Therefore, the Commission concluded that respondent did not "withhold" benefits beginning August 25, 1992.  We disagree.

Webster’s defines "withhold" as "to hold back."  Webster’s Third New International Dictionary 2627 (1971).  As we noted, once a claimant is found to be entitled to TTD benefits, he is entitled to receive them until he "is as far recovered or restored as the permanent character of injury will permit."  
Ingalls
, 241 Ill. App. 3d at 716.  We have already determined that based on the evidence available as of August 25, 1992, a reasonable person in respondent’s position would not have suspended claimant’s TTD benefits.  Thus, by unilaterally deciding that claimant was no longer entitled to TTD benefits, respondent improperly held back those benefits.

Moreover, the fact that claimant received an uninterrupted stream of income is irrelevant to the inquiry whether respondent withheld benefits.  Pursuant to section 8(e) of the Act (820 ILCS 305/8(e) (West 1992)), an employee who suffers the permanent and complete loss of use of a member of the body is entitled to compensation for the period of temporary total incapacity for work resulting from the loss of use of the member 
and
 compensation for the specific loss of use of the member.  Accordingly, claimant was entitled to (1) TTD benefits under section 8(b) of the Act (820 ILCS 305/8(b) (West 1992)), until he reached maximum medical improvement 
and
 (2) PPD benefits under section 8(e)12 of the Act for the permanent and complete loss of the use of his left leg.  Thus, by recharacterizing the nature of the benefits due claimant, respondent prematurely terminated TTD benefits to which claimant was entitled.  Had claimant not challenged respondent’s actions, he would have been deprived of TTD benefits due him between August 26, 1992, and the date that he reached maximum medical improvement.

In sum, we find that the Commission’s decision to vacate the penalties awarded claimant under sections 16, 19(k), and 19(l) of the Act is against the manifest weight of the evidence.  However, 
 because respondent timely paid a portion of the TTD benefits due claimant and since claimant has not challenged the reduction in TTD benefits imposed by the Commission, we must recalculate the penalties due under section 19(k) of the Act and the attorney’s fees due under section 16 of the Act. See 
Scott v. Industrial Comm’n
, 184 Ill. 2d 202, 220 (1998); 
Roodhouse Envelope Co. v. Industrial Comm’n
, 276 Ill. App. 3d 576, 58-084 (1995). 

The Commission determined that claimant was entitled to TTD benefits in the amount of $216.26 per week for 30 1/7 weeks,  In its petition for rehearing, respondent claims that it timely paid TTD benefits to claimant from June 16, 1992 until August 25, 1992 (10 1/7 weeks).  We agree that the period of time from June 16, 1992, to August 25, 1992, encompasses 10 1/7 weeks.  However, the record reflects that respondent timely paid only 10 weeks of TTD.  According to the Request for Rehearing, which was signed by counsel for both parties and submitted to the arbitrator, respondent timely paid a total of $2,162.60 (10 weeks) in TTD benefits.  As a result, the unpaid TTD amounts to $4,356.09 ($216.26/week x 20 1/7 weeks).  Therefore, claimant is entitled to a section 19(k) penalty in the amount of $2,178.05, representing 50% of the unpaid TTD benefits and attorney’s fees under section 16 in the amount of $871.22, representing 20% of the unpaid TTD benefits.

III.  CONCLUSION

For the aforementioned reasons, we reverse the decision of the circuit court of Will County finding that the Commission’s determination that claimant suffered a permanent disability to the extent of 20% of the person as a whole was against the manifest weight of the evidence.  We also reverse that portion of the circuit court’s order confirming the Commission’s vacation of additional compensation under sections 19(k) and 19(l) of the Act and attorney’s fees under section 16 of the Act.  We remand with directions that the section 19(k) penalty be reduced to 
$2178.05 and the attorney’s fees assessed under section 16 be reduced to $871.22.  The section 19(l) penalty shall remain as determined by the arbitrator.

Reversed and remanded with directions.

McCULLOUGH, P.J., HOLDRIDGE and RARICK, JJ., concur.

JUSTICE RAKOWSKI, concurring in part and dissenting in part.

I agree that the Commission’s award of 20% of a person as a whole is not against the manifest weight of the evidence.  Unlike the majority, however, I believe that the Commission properly terminated TTD upon claimant’s return to school.  Thus, the Commission’s denial of penalties was also proper.  Accordingly, I would reverse the judgment of the circuit court and affirm the Commission’s decision in its entirety.

Prior to beginning his summer job with Mobil, claimant had completed his junior year at Illinois State University.  He needed 16 more credit hours and planned to work at Mobil until August 25, 1992, and return to college.  There is no question that the job was temporary summer employment.

When claimant returned to school he removed himself from the job market.  This is the basis for both employer’s termination of TTD and the Commission decision to deny penalties.  I respectfully submit that under the facts of the case, the Commission’s decision to deny penalties is not against the manifest weight of the evidence.