ELMHURST MEMORIAL HOSPITAL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Debbie Oblak, Appellee).

Second District (Industrial Commission Division)   No. 2—00—1331WC

Opinion filed July 17, 2001.

Eugene F. Keefe and Joseph R. Needham, both of Alholm, Monahan, Keefe & Klauke, of Chicago, for appellant.

Stephen J. Smalling, of Capron & Avgerinos, P.C., of Chicago, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, Debbie Oblak, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1992)), seeking benefits for injuries she sustained on August

11, 1992, while working as a nurse in the employ of Elmhurst Memorial Hospital (Elmhurst). The Industrial Commission (Commission) ordered Elmhurst to pay the claimant $228 per week for 156.66 weeks for 66²/₃% permanent partial disability (PPD) to her right arm, $253.33 per week for 90⁴/₇ weeks for temporary total disability (TTD), and $40,419.36 in medical expenses. The circuit court of Du Page County confirmed the Commission's decision. On appeal, Elmhurst contends only that the portion of the Commission's decision ordering it to pay $40,419.36 in medical expenses is against the manifest weight of the evidence.

On August 11, 1992, the claimant sustained an injury to her right hand and arm while working as a nurse for Elmhurst. According to the claimant, she immediately began to experience pain in her right hand and wrist. The claimant sought medical attention at Elmhurst's emergency room on August 13, 1992. At that time, she was diagnosed as suffering from a sprained right wrist. The emergency room physician prescribed a splint and instructed her to seek follow-up treatment from her own physician.

In the five months that followed, the claimant came under the care of seven physicians, four of whom were recommended by Elmhurst, and was treated with therapy and anti-inflammatory medications. Dr. Frank Lagattuta diagnosed the claimant with tenosynovitis of the carpal bone and was of the impression that she sustained an ulnar lesion. Dr. Denes Martonffy arrived at a differential diagnosis of muscular/tendon avulsion of the distal aspect of the upper right extremity and possible soft tissue trauma to the right ulnar nerve at wrist level. During that same period of time, the claimant had an arthrogram, an MRI, and an EMG, none of which revealed any abnormalities. She continued, though, to complain of a burning-type sensation in her right wrist and forearm.

On January 15, 1993, the claimant came under the care of Dr. Kenneth Schiffman. He recorded that the claimant complained of a burning-type pain which seemed to start at the volar ulnar aspect of the forearm with radiation of the pain up the forearm and to the volar aspect of the wrist. He also noted that she complained of occasional numbness and tingling in her fingers. On examination of the claimant's right upper extremity, Dr. Schiffman noted a swelling or prominence at the distal volar ulnar forearm, slightly tender to palpation. His impression at that time was that the claimant injured the flexor superficialis to the small finger and may have disrupted the muscle at the myotendinous junction. Dr. Schiffman recommended occupational therapy with a hand therapist.

The claimant next saw Dr. Schiffman on February 11, 1993. His

note of that visit reflects that the claimant still complained of a burning-type pain along the volar ulnar aspect of the wrist and also some pain along the dorsal aspect of the wrist in the region of the distal radial ulnar joint. Dr. Schiffman still was of the impression that the claimant had a possible flexor myotendinous tear. Because the claimant received no relief from therapy and all attempts at conservative treatment had failed, Dr. Schiffman recommended surgery.

On February 24, 1993, Dr. Schiffman performed exploratory surgery on the claimant's right forearm flexor compartment. The myotendinous junction was found to be intact and minimal flexor adhesion was noted.

The claimant continued to treat with Dr. Schiffman postoperatively. His notes state that the claimant continued to complain of pain to the distal aspect of the right distal radial joint as well as at the distal end of the right ulna. Dr. Schiffman recommended a CT scan.

On April 6, 1993, the claimant again saw Dr. Schiffman. Her CT scan showed no signs of subluxation of the distal radioulnar joint. However, the claimant continued to complain of pain to the ulnar aspect of the wrist. Because of the claimant's ongoing pain, Dr. Schiffman recommended that she undergo an arthroscopic examination with a possible triangular fibrocartilage complex debridement and a possible ulnar shortening osteotomy.

At the request of Elmhurst, Dr. Charles Carroll examined the claimant on May 5, 1993. He recorded the claimant's complaints of pain and burning over the ulnar aspect of her right wrist, tenderness over the distal ulna and triangular fibrocartilage complex region, and numbness and pain radiating from her elbow. Dr. Carroll was of the impression that the claimant exhibited evidence of ulnocarpal impingement of her right wrist and a mild ulnar neuritis at the elbow. According to his notes, the ulnar neuritis was responsible for the pain in her forearm, and the ulnocarpal impingement and a possible triangular fibrocartilage complex tear were responsible for her distal ulnar pain. Dr. Carroll wrote that the claimant's options were either to do nothing or to undergo arthroscopy of the wrist and a probable shortening with extra-articular compression plating. He specifically related the claimant's condition to her work-related injury.

On June 3, 1993, Dr. Carroll performed an arthroscopy of the claimant's right wrist with debridement of a triangular fibrocartilage complex tear and an ulnar shortening with the application of a plate. His postoperative diagnosis was a triangular fibrocartilage complex tear with ulnocarpal impingement.

Following surgery, the claimant remained under the care of Dr. Carroll. On July 14, 1993, he noted that the claimant was undergoing

therapy and making "slow but steady gains." On November 23, 1993, Dr. Carroll reported that, although the surgery alleviated the claimant's pain traceable to the triangular fibrocartilage complex and distal ulna, she continued to experience a burning sensation to the medial elbow with numbness in the small finger. According to Dr. Carroll, the remaining problem was separate from the ulnocarpal impingement. He noted that the claimant wished to undergo further treatment including an ulnar nerve transportation to alleviate her remaining pain. However, Dr. Carroll recommended that she first see a pain management consultant and suggested Dr. Ron Pawl. Dr. Carroll released the claimant to return to work on that date, but restricted her activities, stating that she was not to use her injured hand.

On January 24, 1994, the claimant was examined by Dr. David J. Capobianco at the Mayo Clinic. Dr. Capobianco's notes of that visit state that he held the impression that the claimant had right hand and arm pain and dysesthesia and that he wished to rule out ulnar neuropathy and test her for sympathetically maintained pain syndrome. He referred the claimant to Dr. Stephen D. Trigg, an orthopedic surgeon in Mayo's department of orthopedic surgery, for further examination.

On February 1, 1994, Dr. Trigg examined the claimant to determine if her persistent hand and wrist pain was due to a reflex sympathetic dystrophy problem. Dr. Trigg concluded that the claimant's pain was due to: the triangular fibrocartilage complex tear and subsequent ulnar recession; a possible subclinical or mild cubital tunnel syndrome, that is, an irritability or compression on the ulnar nerve at the elbow, which is one of the various ulnar neuropathies; and a sympathetically maintained pain syndrome. Dr. Trigg referred the claimant to Dr. Timothy Lamer, an anesthesiologist specializing in pain management, practicing at Mayo's pain clinic. The purpose of the referral was to try a stellate ganglion blockade to temporarily interrupt the claimant's sympathetic nervous system. According to Dr. Trigg, the procedure is both diagnostic and therapeutic.

On February 11, 1994, the claimant was examined by Dr. Lamer. After examining the claimant, he arrived at a differential diagnosis of ulnar neuralgia versus reflex sympathetic dystrophy. Specifically, Dr. Lamer testified that he was of the impression that the claimant had right ulnar neuropathy exacerbating postoperative pain on the volar aspect of the arm. Dr. Lamer also testified that, in his opinion, the condition he diagnosed was causally related to the claimant's injury at work. Dr. Lamer injected the claimant's right ulnar nerve with a local anesthetic and an anti-inflammatory solution which resulted in complete relief from pain for the duration of the anesthetic followed

by a gradual return of the claimant's symptoms over a four-day period.

Dr. Lamer and his associate, Dr. Shields, continued to treat the claimant with injections from February 1994 through September 1994. During that period, the claimant was given in excess of 10 injections to her right ulnar nerve and forearm. Although the injections gave the claimant temporary relief, her pain persisted. Dr. Lamer testified that, in late September or early October, he came to the conclusion that the plate in the claimant's arm might be the cause of part of her continuing pain and that it should, therefore, be removed.

On November 8, 1994, Dr. Trigg removed the plate in the claimant's arm and performed an arthroscopy on her right wrist. During the procedure, Dr. Trigg removed a new triangular fibrocartilage complex tear. Following the procedure, Dr. Trigg prescribed a course of physical therapy.

After her surgery, the claimant continued to see Dr. Lamer for injection therapy. According to Dr. Lamer, the claimant's symptoms after her surgery were the same as they were preoperatively. His postoperative diagnosis was reflex sympathetic dystrophy, which he considered a new diagnosis and secondary to his original diagnosis.

When the claimant saw Dr. Trigg on February 8, 1995, she reported that she was not improving with therapy. The claimant did state, however, that she was responding to the injection therapy administered by Dr. Lamer. As of that visit, Dr. Trigg was of the opinion that the claimant's ongoing pain was the result of reflex sympathetic dystrophy and there was nothing further from a surgical or therapeutic perspective that he could do for her.

When Dr. Lamer gave his deposition on April 21, 1995, he testified that the claimant's reflex sympathetic dystrophy had "quieted down" and that she was "back to [her] original problem," ulnar neuralgia. Although he was of the opinion that the claimant had reached maximum medical improvement as of that date, she had not been discharged from care. According to Dr. Lamer, the claimant has a "chronic medical condition that she will have for the foreseeable future." The claimant continued to be on medication and Dr. Lamer testified that she "will require periodic surveillance and follow-up." He stated: "She will get in a situation where her pain will get bad and she will need additional attention." He explained that "every time she stretches that nerve, it's going to become inflamed, and the pain is going to flare up."

At the request of Elmhurst, the claimant was examined by Dr. Michael Vender, a hand surgeon, on May 12, 1995. Dr. Vender examined the claimant but did not review the deposition testimony of either Dr.

Lamer or Dr. Trigg or the records from the Mayo Clinic. He admitted that he was not aware that any diagnosis other than reflex sympathetic dystrophy was ever rendered in the claimant's case. Nonetheless, the report of his examination contains his opinions that: the claimant appears to have reached maximum medical improvement as she had not responded to treatment, including pain management; further medical intervention would not provide any significant change in symptomatology; and the claimant is able to perform the job activities of a nurse. Although Dr. Vender opined that the claimant's right hand was functional, he admitted that he could not say that the claimant did not experience pain and stated that the question of why she has undergone several surgical procedures without improvement is beyond a discussion of hand surgery and hand pathology.

Also on May 12, 1995, Dr. Ronald Pawl examined the claimant, again at Elmhurst's request. Dr. Pawl testified that, as of that date, he was of the opinion that "outside of the residuals of her surgical intervention, [the claimant] did not have any medical disorder." He stated that he found no evidence that the claimant suffered from reflex sympathetic dystrophy. Dr. Pawl admitted, however, that he did not review: any records of the claimant's medical care after December 1992; the Mayo Clinic's records; the records of Drs. Carroll, Lamer, and Trigg; or the deposition testimony of Drs. Lamer and Trigg.

When the claimant testified at the arbitration hearing on June 17, 1998, she stated that she was still experiencing pain in her arm with a great concentration in the area of her wrist. She stated that the pain is eliminated temporarily when Dr. Lamer gives her an injection, but any repetitive use of the arm triggers a return of the pain. She also testified that she takes oral pain medication on a daily basis.

The records of the Mayo Clinic reflect that, after he gave his deposition on April 21, 1995, Dr. Lamer continued to treat the claimant's recurrent neuropathic right arm pain with "seriel/monthly axillary local anesthetic nerve blocks." In excess of 27 such injections were administered from April 21, 1995, through May 7, 1998. Dr. Lamer's notes state that each injection gave the claimant approximately three weeks of relief from her pain, followed by "recurrent dysesthesia and vasomotor symptoms."

Following a hearing, the arbitrator issued a decision, finding that the claimant sustained an accidental injury on August 11, 1992, which arose out of and in the course of her employment by Elmhurst and that her condition of ill-being is causally related to the injury she sustained on that date. The arbitrator specifically found the testimony of Dr. Lamer to be more credible than the testimony of Drs. Vender and Pawl. The arbitrator awarded the claimant the sum of $228 per

week for 156.66 weeks for 66⅔% PPD to her right arm, and $253.33 per week for 90⁴/₇ weeks for TTD. In addition, the arbitrator ordered Elmhurst to pay the further sum of $2,293.50, plus whatever amount the claimant owed to Mayo Clinic for treatment rendered on or before April 21, 1995, for medical services. In so doing, the arbitrator specifically found that Elmhurst was not liable for the cost of the claimant's medical care rendered after April 21, 1995, the date upon which her treating physician determined that she had reached maximum medical improvement.

Both the claimant and Elmhurst sought a review of the arbitrator's decision. The Commission issued a decision, with one commissioner dissenting, in which it determined that the arbitrator erred in finding that the care rendered to the claimant after April 21, 1995, was not compensable. The Commission found that the care rendered by Dr. Lamer was reasonable and necessary as it provided relief from an ongoing condition. As a consequence, the Commission awarded the claimant $38,125.86 for medical expenses incurred at the Mayo Clinic in addition to the $2,293.50 awarded by the arbitrator and ordered Elmhurst to pay the claimant the sum of $40,419.36 for medical expenses. In all other respects, the Commission affirmed and adopted the decision of the arbitrator.

On appeal from the circuit court's order confirming the Commission's decision, Elmhurst argues that the decision to award the claimant the sum of $40,419.36 for medical expenses is against the manifest weight of the evidence. Specifically, it contends that there is no evidence that the treatments rendered to the claimant after April 21, 1995, at the total cost of $38,125.86, were either reasonable or medically necessary. We disagree.

●1 Under the provisions of section 8(a) of the Act, an employer is required to pay for all necessary medical, surgical, and hospital services that are reasonably required to cure or relieve the effects of an accidental injury sustained by an employee and arising out of and in the course of her employment. 820 ILCS 305/8(a) (West 1998). An employer's liability under this section of the Act is continuous so long as the medical services are required to relieve the injured employee from the effects of the injury. *Efengee Electrical Supply Co. v. Industrial Comm'n*, 36 Ill. 2d 450, 453, 223 N.E.2d 135 (1967). However, the employee is only entitled to recover for those medical expenses which are reasonable and causally related to her industrial accident. *Zarley v. Industrial Comm'n*, 84 Ill. 2d 380, 389, 418 N.E.2d 717 (1981). The question of whether medical treatment is causally related to a compensable injury is one of fact to be determined by the Commission, and its finding on the issue will not be reversed on review

unless contrary to the manifest weight of the evidence. *Zarley*, 84 Ill. 2d at 389-90.

●2 For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992). The Commission's determination on a question of fact is against the manifest weight of the evidence only when no rational trier of fact could have agreed. *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 120, 675 N.E.2d 175 (1996). The appropriate test is whether there is sufficient evidence in the record to support the Commission's determination. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450, 440 N.E.2d 90 (1982).

●3 In this case, Dr. Lamer testified that the claimant suffers from ulnar neuralgia which, in his opinion, is causally related to her injury on August 11, 1992. Although Dr. Lamer testified that the claimant had reached maximum medical improvement by April 21, 1995, that is to say, she had recovered as far as the permanent character of her injury would permit (see *Mobil Oil Corp. v. Industrial Comm'n*, 309 Ill. App. 3d 616, 626, 722 N.E.2d 703 (1999)), he found her condition to be chronic. The injection therapy administered to the claimant after April 21, 1995, did nothing to cure her condition, but the record certainly supports the conclusion that the injections helped to "relieve the effects" of her injury, namely, the chronic pain she suffers. As such, the expenses which the claimant incurred for the injections she received after April 21, 1995, are recoverable under section 8(a) of the Act (820 ILCS 305/8(a) (West 1998)). We find, therefore, that the Commission's decision is not against the manifest weight of the evidence.

For the foregoing reasons, we affirm the circuit court's order confirming the Commission's decision.

Affirmed.

McCULLOUGH, P.J., and O'MALLEY, HOLDRIDGE, and RARICK, JJ., concur.