# Illinois Official Reports

## Appellate Court

*Bob Red Remodeling, Inc. v. Illinois Workers' Compensation Comm'n*,
2014 IL App (1st) 130974WC

| | |
|---|---|
| Appellate Court Caption | BOB RED REMODELING, INC., Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Zenon Lemanski, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division<br>Docket No. 1-13-0974WC |
| Filed | December 31, 2014 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-L-50727, 12-L-50742; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | L. Elizabeth Coppoletti and Susan A. Garver, both of Nyhan, Bambrick, Kinzie & Lowry, P.C., of Chicago, for appellant.<br><br>Matthew J. Belcher and Brian J. Wiehe, both of Belcher Law Office, of Chicago, for appellees. |

JUSTICE HUDSON delivered the judgment of the court, with opinion.

Presiding Justice Holdridge and Justices Hoffman, Harris, and Stewart concurred in the judgment and opinion.

**OPINION**

## I. INTRODUCTION

Respondent, Bob Red Remodeling, Inc., appeals an order of the circuit court of Cook County confirming the decision of the Illinois Workers' Compensation Commission (Commission). For the reasons that follow, we affirm.

## II. BACKGROUND

It is undisputed that claimant, Zenon Lemanski, suffered a work-related accident on July 27, 2007, when he fell 11 feet from a rooftop while performing duties for respondent. He was transported by ambulance to Advocate Illinois Masonic Hospital where a CT scan revealed small temporal lobe contusions and a seven millimeter acute hemorrhage. On August 3, 2007, claimant underwent a left craniotomy, performed by Dr. Leonard Kranzler. While in the hospital, claimant engaged in speech, physical, and occupational therapy. He was discharged on August 15, 2007, with the following diagnoses: frozen left shoulder; right knee pain; postconcussion syndrome; and traumatic brain injury. Claimant speaks Polish but not English.

Following his discharge, claimant followed up with Kranzler. He also sought care from Dr. Gourineni, an orthopedic specialist. Gourineni recommended physical therapy for claimant's shoulder and ordered an MRI of his knee. Gourineni further recommended arthroscopic surgery, but claimant declined. In January 2008, Gourineni released claimant from medical care and directed him to continue activities as tolerated.

Claimant was examined by Dr. Victor Forys, at the request of his attorney. Forys is board certified in internal medicine. He diagnosed traumatic brain injury, knee pain, and shoulder pain. Forys recommended Zoloft. Claimant continued to see Forys through the date of the arbitration hearing.

At respondent's behest, claimant was examined by Dr. Felise Zollman. She opined that claimant suffered a work-related accident in July 2008. She diagnosed a moderate brain trauma; a right-knee meniscus tear; and left shoulder pain and stiffness with no range-of-motion limitation. She also diagnosed mild degenerative lumbar spine changes and depression, "likely secondary to" traumatic brain injury. She believed claimant's condition was causally related to his at-work injury. She recommended a neuropsychological assessment–conducted by a doctor fluent in Polish–to evaluate residual cognitive impairment. Respondent authorized the course of treatment recommended by Zollman.

On February 19, 2009, Forys referred claimant to Dr. Anna Wegierek. Wegierek, a psychologist, opined that claimant's "neuropsychological instability" prevented him from continuing "his daily living activities without supervision" and rendered him unable to participate in occupational activities. Zollman reviewed and criticized Wegierek's methodologies. Based on Zollman's criticisms, respondent informed claimant's attorney that it

would no longer authorize treatment with Wegierek. Forys also referred claimant to Dr. Chiappidi, a neurologist. Chiappidi evaluated claimant on March 20, 2009. Chiappidi diagnosed claimant with post-traumatic syndrome and recommended a change in claimant's medications, which Forys did not implement.

¶ 9        Claimant was evaluated by Dr. Jerry Sweet on November 10, 2009. Sweet conducted an interview and performed a number of tests. An interpreter translated Sweets instructions and questions into Polish. Sweet observed a number of measures indicating insufficient effort and opined that the test results generated likely did not validly reflect post-injury functioning. However, Sweet stated, "Despite the non-credible presentation in this evaluation, it is clear that [claimant] suffered a serious traumatic brain injury." Nevertheless, "present findings do not allow a clear appraisal" of the effect of that injury.

¶ 10       An evidence deposition of Dr. Forys was conducted on April 22, 2010. Forys testified that he is board-certified in internal medicine. Forys speaks Polish. Forys first saw claimant on January 22, 2008, about six months after his accident. Claimant was 57-years old. Claimant complained of headaches, heaviness, fatigue, dizziness, impulsiveness, anxiety, and decreased concentration. A physical examination revealed a depression in claimant's skull. Claimant had a decreased range of motion in his neck. Claimant's condition has remained essentially the same ever since (Forys had seen claimant a week before the deposition), though physical therapy resulted in a minor, temporary improvement. Forys opined that claimant's condition was permanent and would not improve. Claimant would need assistance with all activities of daily living. At the time of the deposition, claimant's only caregiver was his wife. Forys believed claimant would benefit from home healthcare. He needs care around the clock. Forys testified that claimant is permanently disabled and unable to work.

¶ 11       In his most recent visit with claimant, claimant's wife reported that claimant was having trouble with memory. Forys believed claimant might be developing a degree of dementia. Forys continued claimant on Zoloft, which, he testified, is the only drug approved to treat traumatic brain injury. He also prescribed Wellbutrin, which he thought might give claimant more energy. Forys explained that claimant is not *per se* depressed; rather, he suffers from an organic brain injury. Forys believed claimant should have contact with medical personnel on a monthly basis.

¶ 12       Forys knows Wegierek. She speaks Polish fluently. Her assessments are more objective than those of Forys. He agreed with her opinion that claimant is permanently and totally disabled. Forys opined that claimant would continue to need total nursing care and medical supervision. Further, claimant's condition will deteriorate.

¶ 13       During cross-examination, Forys testified that he could not recall having referred claimant to a specialist in traumatic brain injury. While physical therapy helped for a while, claimant eventually "plateaued." On redirect, Forys testified that there was no treatment that would enable claimant to lead a normal life.

¶ 14       Claimant continued to treat with Forys. Zollman reevaluated claimant on July 8, 2010. She opined that any vertigo experienced by claimant was not due to a central nervous system lesion. Symptom magnification was possibly playing a "significant role in the claimant's current presentation." Neither headaches nor vertigo could be objectively correlated. She recommended claimant stop treating with Forys.

¶ 15       Dr. Zollman was deposed on September 15, 2010. She testified that she specializes in neuro-rehabilitation and medical acupuncture. She is board certified in these areas. She

examined claimant on two occasions–November 3, 2008 and July 8, 2010. At the first visit, in addition to claimant, his wife and a translator were present. Claimant reported left shoulder pain, right knee pain, dizziness, headaches, sensitivity to smell, and "some difficulty with misplacing items around his home." Claimant was "awake, alert, [and] oriented." He primarily spoke Polish. Watching claimant and the interpreter interact, Zollman concluded that claimant "was at least not grossly impaired." He was, on occasion, "very literal," and his affect was "a little bit blunted."

¶ 16    Zollman checked claimant's coordination. While it did not appear normal, "the manner in which it was not normal did not–was not consistent with any kind of recognized physical abnormality." Zollman explained, "[I]t appeared to me to be somewhat contrived or artificial."

¶ 17    Zollman opined that claimant's traumatic brain injury was related to his at-work accident. She believed claimant could return to work on a restricted basis. She recommended a neuropsychological assessment and possibly speech therapy.

¶ 18    Zollman authored a letter dated April 29, 2009, in which she reviewed and criticized Wegierek's methodologies. Zollman noted that Wegierek did not perform any validity testing; she used IQ tests that were originally written in English and translated to Polish; and she relied on only two tests. Zollman recommended that claimant be evaluated by a neuropsychologist who speaks Polish or had a translator available.

¶ 19    When Zollman reevaluated claimant, he reported dizziness and headaches. Knee and shoulder pain "were really not active issues." Claimant's wife stated he was forgetful. At home, claimant feeds and dresses himself (thought his wife lays out his clothes and prepares meals). He takes care of his basic grooming and can go to the bathroom by himself. He needs assistance in the shower. They take walks on a daily basis. Claimant's responses to specific questions were often vague, but he did not appear to suffer from short-term memory problems. Claimant's gait was normal, and he was able to do a deep-knee bend. Claimant described vertigo; however, what he described was not consistent with "benign positional vertigo," which Zollman had previously diagnosed. She agreed with Sweet that treatment "should be geared towards psychological and psychiatric care." Zollman believed that Forys was not providing appropriate care and that he was not "current in his understanding of traumatic brain injury." She disagreed that claimant's condition would worsen, as a traumatic brain injury is not a degenerative event.

¶ 20    On September 23, 2010, respondent moved, *inter alia*, to terminate payment of benefits under the Act, arguing claimant's failure to obtain appropriate care in accordance with Zollman's recommendations constituted an injurious practice. See 820 ILCS 305/19(d) (West 2010). The hearing in this case, which encompassed respondent's motion to terminate, was had on October 19, 2010. Respondent presented documentary evidence and the deposition of Zollman. Claimant called four witnesses. The first identified a video recording showing claimant engaged in daily activities.

¶ 21    Claimant's wife, Malgorzata Lemanski, then testified. She related that claimant had obtained vocational training in Poland and worked as a mechanic. They also operated a deli for 10 years. In 2003, they came to America. Claimant, who did not speak English, worked in construction until 2007.

¶ 22    She assists her husband, who is 59 years old, in the shower, and she cannot leave him alone for more than a few hours. He cannot drive or take the bus by himself. He gets confused and loses his way. She tried to get him to cook, but he would "just burn the pots and pans" or "turn

on the stove" and forget he did that. He can dress himself. Prior to the accident, Malgorzata worked at a delicatessen. She no longer works because she has to take care of claimant.

¶ 23    Claimant also called Lisa Helma, a certified rehabilitation counselor who speaks Polish. She evaluated claimant on October 5, 2009. Claimant was still in treatment and taking medications. He used a cane and wore glasses. Claimant's wife related to Helma that she was trying to make claimant as independent as possible. She assisted claimant in almost all areas of his life. Claimant had difficulty sleeping, but he would sleep 10 to 12 hours per night and also during the day. Claimant slept a lot due to his depression. Helma reviewed claimant's medical records and educational history. Assuming Zollman is correct that claimant could return to work someday, given his skills, age, and language ability, he would only be able to work in an unskilled position. Moreover, he is only capable of sedentary work. Sedentary, unskilled positions comprise less than one percent of the jobs available in the United States. He does not drive and has no transferable skills. Helma opined that claimant could not work in his usual line of employment, that he was totally disabled, and that absent a "meaningful change in [his] medical status," his disability was permanent. There is no stable market for claimant. Helma did not believe that vocational training would be beneficial to claimant.

¶ 24    During cross-examination, Helma acknowledged that she also works as a veterinary technician. She met with claimant once. She also saw him "briefly in the hall" and asked him if there had been any change in his condition. Her opinions represented "a snapshot [of claimant] as of October 5 of 2009." Helma agreed that it was difficult to assess claimant's abilities in light of his cognitive condition. She also acknowledged that she might not have had good data as it pertained to claimant's IQ score. Moreover, claimant had not undergone a functional capacity evaluation. Helma exemplified unskilled, sedentary labor by pointing to a cashier at a tobacco stand. She clarified that the classification would not apply to all cashier positions. A functional capacity evaluation was performed about a month prior to the hearing, and it indicated claimant was functioning below the sedentary level. Helma agreed that if claimant was returned to a condition where he could perform light to medium duty work and had no cognitive impairment, it was possible "some type of vocational training" would be appropriate.

¶ 25    Claimant then testified on his own behalf. He identified himself and stated he lived in Chicago, but could not recall the name of the street on which he lived. He stated that he is married and has two grown children. He could not recall the last time he saw them. He could not recall the accident or the names of the doctors who treated him. He knew he took medications, but not what type. He stated he could not take the bus by himself, cook, or take a shower. He sometimes needs assistance going to the bathroom. He cannot read or speak English. He thought he had a sandwich for lunch. He was unsure whether he had a telephone. When asked when his birth date was, he answered September of 1950. He thought he wanted to return to work. Claimant testified that he wanted additional treatment.

¶ 26    The arbitrator denied respondent's motion to terminate benefits, and he found that claimant was permanently and totally disabled. He noted that respondent was arguing that claimant's failure to follow Zollman's recommendations regarding appropriate treatment constituted an injurious practice (see 820 ILCS 305/19(d) (West 2010)). Specifically, Zollman recommended vestibular rehabilitation for vertigo; further neuropsychological testing; speech therapy; and psychological testing and perhaps counseling for depression. The arbitrator then observed that claimant has, in fact, "undergone a long course of treatment by qualified physicians and therapists." Further, after stating the credentials of Zollman and Forys, the arbitrator expressly

found Forys more credible. He also specifically credited Helma's testimony. As such, the arbitrator concluded that respondent had not shown that Zollman's recommendations offered a reasonable prospect of restoring claimant to a level at which he could perform work. Accordingly, he found that claimant's failure to follow her recommendations was not a basis for terminating benefits in accordance with section 19(d) of the Act (820 ILCS 305/19(d) (West 2010)).

¶ 27    The arbitrator next found that claimant's condition of ill-being was causally related to his at-work accident. He first stated that "[a]ll of the credible evidence indicates that [claimant's] present condition of ill-being is causally related to the accident." He noted that "[r]espondent has admitted that [claimant] sustained a serious brain injury due to this accident." The sole issue, according to the arbitrator, is whether claimant had engaged in an injurious practice. Having already rejected that argument, the arbitrator concluded that claimant's at-work accident caused his condition. The arbitrator also stated that he had observed claimant while testifying and seen the video documenting how claimant lives on a daily basis.

¶ 28    Turning to the nature and extent of claimant's injury and the need for prospective medical care, the arbitrator first acknowledged Sweet's observations about the reliability of the results of the tests administered to claimant. Even so, Sweet concluded that claimant suffered a "serious traumatic brain injury." The arbitrator noted that Sweet did not address claimant's ability to return to gainful employment. He then relied on Helma's testimony to conclude that claimant is not employable in light of his age, education, training, and experience. Additionally, respondent did not show that a stable labor market existed for claimant. As such, later citing an odd-lot theory, the arbitrator found that claimant was permanently and totally disabled. The arbitrator criticized Zollman's opinion in that she believed for claimant to be a "total care" patient, claimant would have to be unable to feed or toilet himself, needed to be turned in bed, and required constant supervision. The arbitrator pointed out that this does not coincide with the definition of total disability contained in section 8 of the Workers' Compensation Act (Act) (see 820 ILCS 305/8 (West 2010)). He further criticized Zollman's opinion that claimant could return to work in a "supportive employment model" as not referencing an identifiable occupation. The arbitrator then found that Forys's opinion that claimant was permanently and totally disabled was more credible than Zollman's opinion. Because claimant's wife had to give up her job to care for claimant, the arbitrator determined that home healthcare was needed and ordered respondent to pay for a provider for three, eight-hour shifts per week.

¶ 29    Finally, the arbitrator declined to impose penalties and fees against respondent or to order claimant to pay the costs of a deposition which was terminated purportedly due to the conduct of claimant's attorney. Respondent raised an issue as to the chain of referral. The arbitrator concluded that claimant was initially operated on by Kranzler who referred him to Gourineni. Claimant subsequently saw Forys, and all subsequent referrals flowed therefrom. Hence, the arbitrator held all doctors were within the chain of referral contemplated in the Act. The arbitrator also found that claimant had established that he had been entitled to temporary total disability from the date of the arbitration hearing.

¶ 30    After denying various motions for fees and sanctions filed by both parties and a motion to dismiss filed by claimant, the Commission reviewed the arbitrator's decision. Both parties sought review in the circuit court of Cook County (respondent's appeal is case No. 12-L-50727; claimant's is 12-L-50742). The cases were consolidated. The trial court

dismissed respondent's appeal, holding that respondent did not file an effective bond, which deprived the trial court of jurisdiction. Despite this initial finding, the trial court went on to find that the Commission did not abuse its discretion in denying respondent's motion to terminate benefits in accordance with section 19(d) of the Act (820 ILCS 305/19(d) (West 2010)). Respondent now appeals.

¶ 31                                   III. ANALYSIS

¶ 32    On appeal, respondent raises four main issues. First, it challenges the Commission's decision that claimant is permanently and totally disabled. Second, it contends that the Commission should have granted its motion to suspend benefits due to claimant's purported refusal to follow Zollman's recommendations regarding medical treatment. Third, it argues that Forys was not a "valid choice within [claimant's] chain of referral of doctors pursuant to section 8(a)" of the Act (820 ILCS 305/8(a) (West 2010)). Fourth, it contends that the trial court erred in dismissing its case for its alleged failure to file an appropriate bond.

¶ 33    Claimant's final point raises a question regarding our jurisdiction, and we will address it now. To perfect an appeal, a bond must be filed by "the one against whom the Commission shall have rendered an award for the payment of money." 820 ILCS 305/19(f)(2) (West 2010). Case law holds that a corporate officer need not disclose his office and authority when executing a bond and that evidence of that authority may be provided after the usual 20-day period for perfecting an appeal. *First Chicago v. Industrial Comm'n*, 294 Ill. App. 3d 685, 689 (1998). Here, the bond was executed simply by Bob Redlinski. Redlinski later submitted an affidavit stating that he is the president of Bob Red Remodeling, Inc., and that he has authority to bind the corporation to any financial obligation. As such, respondent complied with the requirements of the Act for perfecting an appeal.

¶ 34                          A. PERMANENT TOTAL DISABILITY

¶ 35    Respondent first argues that the Commission erred in finding claimant permanently and totally disabled. We review this finding using the manifest-weight standard. *Mansfield v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120909WC, ¶ 35. Thus, we will not reverse unless an opposite conclusion is clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291 (1992). This is not the case here.

¶ 36    The Commission found that claimant had proved he was permanently and totally disabled based on both the medical evidence and an odd-lot theory. See *Federal Marine Terminals, Inc. v. Illinois Workers' Compensation Comm'n*, 371 Ill. App. 3d 1117, 1129 (2007). Respondent contends that both findings are against the manifest weight of the evidence and, moreover, they are inconsistent. We first turn our attention to the odd-lot theory.

¶ 37    Pursuant to this theory, a claimant may establish that he or she is permanently and totally disabled by showing either a diligent but unsuccessful job search or that his age, training, experience, education, and condition prevent him from obtaining stable and continuous employment. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544 (2007). If the employee is successful, the burden shifts to the employer to show that a stable job market nevertheless exists for the employee. *City of Chicago v. Illinois Workers' Compensation Comm'n*, 373 Ill. App. 3d 1080, 1091 (2007).

¶ 38     Disingenuously, respondent contends that the Commission, having found claimant permanently and totally disabled based on medical evidence, erred by considering the odd-lot theory. According to respondent, since the odd-lot category presumes a claimant can return to work, the Commission should not have addressed it after finding that claimant could not return to work based on his medical condition. However, respondent also contends that claimant has not actually shown he is permanently and totally disabled based on the medical evidence and that the Commission's finding based on the medical evidence is contrary to the manifest weight of the evidence. If respondent is correct that this finding is against the manifest weight of the evidence and the Commission had not addressed the odd-lot theory, we would have to remand to allow it to do so. *Cf. Westin Hotel*, 372 Ill. App. 3d at 545-46 (remanding for finding on permanent disability where odd-lot finding was determined to be contrary to the manifest weight of the evidence). Hence, we perceive no impropriety in the Commission's decision to address both theories in the first instance, as it prejudices no one and furthers the goal of judicial efficiency.

¶ 39     The Commission noted that following his accident, claimant was never offered a job of any sort. It further noted that respondent did not offer any evidence to establish that a job market existed for claimant. It discounted Zollman's testimony that claimant could return to work in a "supported employment model," as that did not describe an identifiable job. Moreover, the Commission cited the testimony of Helma, a certified rehabilitation counselor, who testified that a stable labor market did not exist for claimant. Helma opined that claimant would have to be restored to the light-medium level in order to be employable, qualifying her testimony as a "guarded prognosis" and assuming "no cognitive impairment." A functional capacity evaluation performed about a month prior to the hearing indicated that claimant was functioning below the sedentary level. Thus, the Commission's decision finds support in Helma's testimony.

¶ 40     Respondent attacks the bases underlying Helma's opinion. Such matters are relevant to the weight to which her opinion was entitled. *Cassens Transport Co. v. Industrial Comm'n*, 262 Ill. App. 3d 324, 332 (1994). Hence, these questions are primarily for the Commission to resolve. *Fickas v. Industrial Comm'n*, 308 Ill. App. 3d 1037, 1042 (1999). Moreover, the Commission's expertise in the area of workers' compensation is well established. *Mobil Oil Corp. v. Industrial Comm'n*, 309 Ill. App. 3d 616, 624 (1999). We therefore owe such decisions substantial deference. *Id*. None of respondent's criticisms is so persuasive that we could hold that the Commission was not entitled to rely on Helma's opinion or that an opposite conclusion is clearly apparent.

¶ 41     Accordingly, assuming, *arguendo*, that respondent is correct that the Commission erred in finding claimant permanently and totally disabled based on the medical evidence, claimant was nevertheless entitled to prevail on an odd-lot theory.

¶ 42                      B. REFUSAL TO SUBMIT TO MEDICAL TREATMENT

¶ 43     Section 19(d) of the Act provides, in pertinent part, "If any employee shall persist in insanitary or injurious practices which tend to either imperil or retard his recovery or shall refuse to submit to such medical, surgical, or hospital treatment as is reasonably essential to promote his recovery, the Commission may, in its discretion, reduce or suspend the compensation of any such injured employee." 820 ILCS 305/19(d) (West 2010). In accordance with this provision, "benefits may be suspended or terminated if the employee refuses to

submit to medical, surgical, or hospital treatment essential to his recovery, or if the employee fails to cooperate in good faith with rehabilitation efforts." *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 235 Ill. 2d 132, 146 (2010). Our supreme court has stated, "If a claimant's response to an offer of treatment is within the bounds of reason, his freedom of choice should be preserved even when an operation might mitigate the employer's damages." *Rockford Clutch Division, Borg-Warner Corp. v. Industrial Comm'n*, 34 Ill. 2d 240, 247-48 (1966). Thus, the question before us is whether the course of treatment chosen by claimant was unreasonable. See *Allied Chemical Corp. v. Industrial Comm'n*, 140 Ill. App. 3d 73, 76-77 (1986). This issue presents a question of fact, which we review using the manifest-weight standard. *Id*. at 77.

¶ 44    Respondent complains that claimant did not follow Zollman's recommended course of treatment. Zollman recommended vestibular therapy for vertigo, neuropsychological testing, speech therapy, and psychological testing and counseling if indicated. The Commission noted that claimant had, in fact, "undergone a long course of treatment by qualified physicians and therapists." After reciting Zollman's and Forys's qualifications, the Commission found Forys more credible. It also noted Helma's testimony, and then found that respondent had not established that Zollman's recommended course of treatment offered "a reasonable prospect of restoration or relief from incapacity." We cannot say that this finding is contrary to the manifest weight of the evidence.

¶ 45    Indeed, we note that, in essence, respondent is complaining that claimant chose to follow the advice of his treating physician rather than that of Zollman. Admittedly, Zollman's credentials with respect to brain injuries are more substantial than those of Forys. However, Forys is board certified in internal medicine, and his credentials are not insignificant. We recognize that several other doctors agreed with Zollman's assessment. Nevertheless, the question is not which course of treatment was superior, it is whether claimant's behavior was reasonable under the circumstances. As claimant was following the advice of his own qualified physician, we could not say that his choices were unreasonable. At the very least, we certainly could not say that an opposite conclusion to the Commission's on this issue is clearly apparent.

¶ 46                                    C. CHAIN OF REFERRAL

¶ 47    Finally, respondent contends that Forys was not within the allowable chain of referral, as claimant had purportedly previously elected to treat with Kranzler and Gourineni, which would make Forys claimant's third chosen doctor. Section 8(a) of the Act (820 ILCS 305/8(a) (West 2010)) limits an employer's liability to pay for medical services to (1) first aid and emergency services and (2) two additional doctors chosen by an employee and any additional providers and services recommended by those two doctors. See *Absolute Cleaning/SVMBL v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 463, 468-69 (2011). If either Kranzler or Gourineni was not a choice within the meaning of section 8(a), Forys would be claimant's second choice and respondent would not be shielded from liability for his services. This issue presents a question of fact subject to review using the manifest-weight standard. *Id*.

¶ 48    The Commission found that claimant was transported by ambulance to Advocate Illinois Masonic Hospital. While there, he was operated upon by Kranzler. Subsequently, he was referred to Gourineni. It further found that Forys was claimant's first choice of a physician, which indicates that the Commission regarded Kranzler as providing emergency care. If either

of these findings regarding Kranzler's and Gourineni's involvement in claimant's care is not contrary to the manifest weight of the evidence, respondent is liable for Forys's services.

¶ 49    Having reviewed the record, we cannot say that the Commission's conclusion that Kranzler was providing emergency services is against the manifest weight of the evidence. As noted, claimant was transported by ambulance to the emergency room on July 27, 2007. He was admitted to the hospital and remained in the intensive care unit from that day through the day on which Kranzler performed surgery (August 3, 2007). Kranzler's operative report states that claimant was monitored for several days and experienced a "progressively severe headache combined with nausea and vomiting." This "pattern persisted." The report of the surgery indicates that "dark red clotted blood was found" inside claimant's skull. Also, "a small bleeding point was coagulated." The Commission could readily conclude that Kranzler's treatment of claimant was in response to an ongoing emergency, which flowed continually from claimant's accident. Moreover, given that this is a medical issue, we owe increased deference to the Commission due to its expertise in such matters. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979).

¶ 50    Respondent argues that Kranzler's care did not constitute emergency treatment. It points out that Kranzler did not operate on claimant until a week after claimant's accident. Moreover, claimant continued to follow up with Kranzler for over four months after the surgery. Respondent set forth a portion of a dictionary's definition of "emergency" in support of its argument: "an unforeseen combination of circumstances or a resulting state that calls for immediate action," "a pressing need," "a sudden bodily alteration such as is likely to require *immediate* medical attention (as a ruptured appendix or surgical shock)." (Emphasis added.) Webster's Third New International Dictionary 740 (2002). We note that the same dictionary defines "immediate" as "acting or being without the intervention of another object, cause, or agency." Webster's Third New International Dictionary 1129 (2002). Here, claimant's medical care following his accident was continuous, and Kranzler's surgery was a part of that course of care. Thus, claimant received medical care without the "intervention of another object, cause, or agency." As such, the Commission could reasonably determine that the surgery was "emergency treatment" within the meaning of section 8(a).

¶ 51    As for the follow-up visits, there is no indication that they consisted of any sort of treatment other than the type that ordinarily follows a surgical procedure. While we find no Illinois case law on this point, we find the following foreign authority persuasive. In *Ceco Steel, Inc. v. District of Columbia Department of Employment Services*, 566 A.2d 1062 (D.C. Cir. 1989), the District of Columbia Court of Appeals discussed what it termed "constructive selection." A claimant constructively selects a medical provider who has provided emergency treatment if follow-up care is "extended beyond reasonable limits." *Id*. at 1064. In other words, if the treatment a claimant receives from a medical provider who has previously provided emergency services is of the sort that typically follows such emergency services, the medical provider does not constitute a choice of the claimant's. This rule is logically sound and bears obvious relevance to this case.

¶ 52    Here, nothing in the record indicates that the services provided by Kranzler were anything other than ordinary follow up to the surgery he performed following claimant's accident. Kranzler saw claimant on November 8, 2007, and December 5, 2007. Letters written by Kranzler to claimant's insurance carrier describe both visits as follow-ups to claimant's surgery. Nothing is discussed outside of claimant's head injury. Thus, the available evidence

indicates that claimant's post-surgery visits with Kranzler were nothing more than ordinary follow-up appointments. As such, they are directly related to the emergency surgery and do not constitute a choice of a medical provider for the purpose of section 8(a) of the Act (820 ILCS 305/8(a) (West 2010)).

¶ 53 Accordingly, Forys was, at most, claimant's second choice of doctors (we therefore need not address Gourineni's status). We affirm this portion of the Commission's decision.

¶ 54                                        IV. CONCLUSION

¶ 55 In light of the forgoing, the judgment of the circuit court of Cook County confirming the decision of the Commission is affirmed.

¶ 56 Affirmed.